JOVER Y COSTAS *v.* INSULAR GOVERNMENT OF THE PHILIPPINE ISLANDS.

INSULAR GOVERNMENT OF THE PHILIPPINE ISLANDS *v.* JOVER Y COSTAS.

APPEALS FROM AND IN ERROR TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

Nos. 112, 113. Argued April 7, 1911.—Decided May 29, 1911.

Article 46 of the constitution of Spain as existing in 1859, providing that in order to alienate, cede or exchange any part of Spanish territory, the King required the authority of a special law, related to transference of national sovereignty and not to disposal of public land as property.

The laws of the Partida which affirm that the sea and its shore are among the things that are common to all men are not to be so literally construed, as held by the Spanish courts prior to the cession of the Philippine Islands, as prohibiting a grant of tide lands to one desiring to reclaim and improve them.

The Governor General of the Philippine Islands under Spanish rule possessed all the powers of the King except where otherwise provided, and a grant of lands made by him was valid unless in violation of law specially prohibiting him from making it.

Where the local authorities in the Philippine Islands, with full knowl-

edge of the circumstances under which a grant was made, imposed taxes on the property for many, in this case thirty-nine, years, it is persuasive proof that the grant was valid and that the Governor General did not exceed his authority in making it.

A grant of tide lands, although made upon condition of reclamation, is not defeated by failure to reclaim if the granting words import a present and immediate transfer of ownership; and so *held* as to a grant of such lands in the Philippine Islands where the grantee was "granted possession and ownership," and there was no express condition either precedent or subsequent that the land be reclaimed within any definite period.

Where a practical interpretation has been given to a grant of land by the public officials authorized to interpret it, full effect should be given thereto.

The appropriate method to review judgments of the Supreme Court of the Philippine Islands in cases from the Court of Land Registration is by writ of error and not by appeal.

10 Phil. Rep. 522, reversed.

THE facts, which involve the validity of a grant of lands in the Philippine Islands, made prior to the cession to the United States, are stated in the opinion.

*Mr. Aldis B. Browne,* with whom *Mr. W. A. Kincaid, Mr. Alexander Britton, Mr. J. H. Blount* and *Mr. Evans Browne* were on the brief, for plaintiffs in error.

*Mr. Assistant Attorney General Fowler* for the Philippine Islands (Insular Government).

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This was a petition to the Court of Land Registration of the Philippine Islands for the registration of the title to a tract of land in the City of Manila, claimed to have been granted to Don Jose Camps, February 12, 1859, by a decree of the Governor General of those Islands, reading as follows:

"Acting upon the petition in which Don Jose Camps on November 17, 1858, solicited a grant for the land which he fills at his expense on the lowlands situated along the northern wharf (Murallón del Norte) and on the north side thereof, on the right side of the mouth of the Pasig River, with an extension of 200 brazas in length and 100 brazas in width, beginning at a distance of 25 varas (Spanish yards) west of the bridge built on said wharf for the connection of the waters of the river and of the bay from the Beach of Binondo, as appears on the plan hereto attached, to which land, after it has been filled in he intends to move his artistic establishment called 'Camps é Hijos,' and a manufactory of hemp rope; in view of the report made on the 26th of the said month of November by the Alcalde Mayor 1.° of Manila, who, after consultation with the director of public works of the province, is of the opinion that the waste land asked for should be granted to Camps, said land being at present covered by the sea, and being far from the houses situated on the Binondo beach, it is very suitable for purposes of maritime commerce and it is convenient for the purpose of public adornment, that the foundry, iron-working and scientific instrument establishment of Camps é Hijos be located on that place provided that the said Camps shall agree not to erect such buildings with brick and stone or strong materials, for the reason that the same is outside of the military lines; in view of the report made on December 17, 1858, by the Commanding General of Marine, in agreement with the captain of the port regarding the convenience of such concession for the merchant marine and public adornment, but with the precise condition that Camps shall leave a distance of 16½ varas between the outside edge of the wharf and the intended building, which width is the one fixed for wharves; in view also of the report of the sub-inspector of engineers, with the approval of the commander of the

post, proposing that the concession asked for shall not be granted for a building of strong materials, on account of the forts of the place, and that the building to be erected shall consist of only one story, and shall be removed at the expense of its owner, at the discretion of the superior authority of the Islands, when the public interests so require, taking into consideration the circumstances and official and industrial merits of the said Don Jose Camps, and the offer of protection stated in the decree dated November 4, 1858, when refusing the sale, asked for by him, of an irregular piece of land adjoining the new *Cuartel del Carenero*, and in conformity with the above-mentioned reports of the commanding general of marine, the sub-inspector of engineers and the civil chief of the Province of Manila, I hereby decree: Don Jose Camps, *comisario de guerra honorario, oficial mayor jubilado* of the office of the secretary of his superior government, and director of the iron-working and nautical instrument establishment of Camps é Hijos, is granted the possession and ownership of a parcel of land 200 brazas in length and 100 brazas in width, covered at present by the waters of the sea, near the Binondo beach, which land is situated alongside the Murallón del Norte, and requested authority to fill in the same at his expense, is also hereby granted, subject to the following conditions and restrictions:

"First. The land to be filled in shall form a quadrangle 200 brazas long and 100 brazas wide; beginning on the longer side, nearest to the Pasig River, at a point 25 varas from the bridge connecting the waters of the river and of the bay, and running parallel with the wharf toward the lighthouse.

"Second. The buildings to be erected by Camps on this new land so granted shall be located along the said longer side parallel to the breakwater, separated from the edge of the exterior wharf for its whole length, a distance of 16½ varas, which is the width required for wharves.

"Third. The said buildings shall consist of only one story, no materials of the kind prohibited in the military zone shall be employed therein, and shall be roofed with zinc, tarred paper, nipa or other similar materials.

"Fourth. The said buildings shall be removed at the expense of Don Jose Camps or his successors whenever, at the discretion of the superior authority of the Islands, the military service so requires.

"Let the interested party be notified and a certified copy be issued to him.

(Signed) NORZAGARAY."

Opposition to the registration was made by the Insular Government and the City of Manila upon the ground that the grant was unauthorized because the land was a part of the shore of the sea. The Court of Land Registration pronounced the grant valid, sustained the petitioner's asserted ownership of all existing title under it, construed it as made upon condition that the land be reclaimed from the sea, found that the condition had been fulfilled as to part of the land only, and entered a judgment allowing registration of that part and refusing registration of the remainder. Appeals to the Supreme Court of the Philippines resulted in an affirmance of the judgment by an opinion saying:

"Although we are unable to agree upon the grounds upon which our conclusion is based, we are of the opinion that the judgment of the Court of Land Registration should be affirmed, without costs to either party." 10 Phil. Rep. 522.

One member of the court (Johnson, J.) dissented because he was of opinion that the grant was not made upon condition that the land be reclaimed, and another member (Tracy, J.) dissented because he was of opinion that the grant, being of land covered by tidal waters, was one which only the King of Spain could make. Each of the parties

has appealed to this court and has also sued out a writ of error.

In addition to the authenticity of the grant and the petitioner's ownership of all existing title under it, neither of which was questioned, the facts disclosed by the record are these: At the date of the grant the land was marshy waste land, which was covered by the sea at high tide and was uncovered at low tide. Soon after the grant was made the grantee marked its boundaries and began filling in the land. In the course of twenty years, about one-third of the tract was reclaimed and was then improved by erecting warehouses and other buildings thereon. At irregular intervals further work was done toward filling in the remainder, but the area fully reclaimed was not materially enlarged. The grantee and those claiming under him were in the exclusive occupancy and use of the land reclaimed from the time the work was done and at all times asserted title to the entire tract, and intended to complete its reclamation. What was done by them in filling in and improving the land was done openly and at large expense, and neither their work nor their occupancy was at any time disturbed, although both were at all times well known to those in authority at Manila. Nor was the validity or extent of the grant in any wise called in question while the Philippines remained under the dominion of Spain, or until four years thereafter, which was forty-four years after the date of the grant. On the contrary, taxes were imposed upon the land as private property, and at the commencement of the proceeding for registration the land and the improvements were assessed to the petitioner at a valuation of $255,578.00.

It is the contention of the Insular Government and the City of Manila that the grant was unauthorized and void, first, because the King of Spain was without power to make it, and so could not devolve that power upon the Governor General, and second, because, even if the King possessed

that power, he had not devolved it upon the Governor General.

The first branch of the contention is rested, primarily, upon Article 46 of the then constitution of Spain, which declared that "to alienate, cede or exchange any part of Spanish territory" the King required "the authority of a special law," and, secondarily, upon laws 3 and 4, title 28, Partida 3, which affirm that the sea and its shore are among the things which belong in common to all men. Of the article in the Spanish constitution it is enough to say that it obviously did not relate to the disposal of public land as property, but only to the transference of national sovereignty; and of the laws cited from Partida 3 it is enough to say that the same meaning and influence must be attributed to them now that were attributed to them by the Supreme Judicial Tribunal of Spain in its decision of May 1, 1863 (Book 8, p. 288), wherein, in sustaining a royal order of January 15, 1853, making a grant of tide land to one who desired to reclaim and improve it, it was said:

"While it is true that Partida 3, title 28, laws 3 and 4, in determining what things are the common right of men and how they may use them, enumerates as such, among other things, the sea and its shore, this is not to be taken in an absolutely literal manner, since a number of limitations to the general proposition have been recognized for the common benefit of the community as being conducive to the general welfare of the State, which latter may grant shore land for improvement where the same has not already lawfully come under private ownership."

As then the King possessed the power to make the grant, we come to the second branch of the contention, namely, that he had not devolved that power upon the Governor General. Many royal orders bearing upon the subject have been called to our attention. The one of first importance is embodied in law 11, title 15, book 2, Laws of the Indies, and reads as follows:

"In the city of Manila, Island of Luzon, capital of the Philippines, another audiencia and royal chancellory is established, with a president, *who shall be the Governor and Captain General;* four associate judges (oidores), who shall also be criminal judges (alcaldes el crimen); one fiscal; one high constable; one vice grand chancellor (teniente de gran chanciller), and the other necessary ministers and officials; and the said audiencia shall have as its district the lands of the said island of Luzon, already discovered and which may be discovered. And *we order that the governor and captain general* of the said Islands and provinces, and president of the royal audiencia of the same, *hold exclusively the superior government of the whole district of said audiencia in peace and in war, and make in our royal name these sentences and grant those favors, which, in conformity with the laws of this 'Recopilacion' and of these Kingdoms oj Castile, and with the instructions and powers received from us, he may and ought to make, and in all* those administrative cases and *matters of importance*, the said president-governor shall try the same together with the oidores of said audiencia in order that they may give him their opinion in consultation, and after hearing the same, *he shall provide for what is best for the service of God and our own interests and the peace and tranquility of the said province and community.*"

Without doubt it was intended by this order to invest the Governor General with large powers and a wide range of discretion, fully commensurate with the situation in which they were to be exercised. The language used was general and comprehensive. Possibly, according to Spanish standards, its meaning was much the same as if it had been said directly that the Governor General of the Philippines was empowered thereby to do in that distant province whatever the King could do, if he were present, save where it was otherwise specially provided. The other orders bearing upon the subject are not inconsistent with

that view of it.   But whatever the original meaning of the order may have been, the one suggested was adopted and adhered to by the successive governors general, and their action in that regard was acquiesced in, and therefore ratified, by the King.   Thus, in the course of approved usage, the order came to be, in effect, the same as the one relating to the viceroys of Peru and New Spain, which is embodied in law 2, title 3, book 3, Laws of the Indies, and declares, "they shall do what they may think and consider to be suitable, and provide for everything we might do, and provide for, of whatever quality and condition it may be, in the provinces under their charge, as if the same were governed by ourselves, in all cases where no special prohibition exists."

Recognition of this is found in Coronado's Legislacion Ultramarina, vol. 2, pp. 175, 176, where, after stating that the powers of the governors general of the Philippines and other provinces beyond the seas include the powers named "under the titles of viceroys and presidents in the Laws of the Indies," the author proceeds:

"This consolidation of such vastly important powers, although it has some inconveniences, has been deemed necessary in order to surround with prestige and sustain a superior authority, at so great a distance from the sovereign, in the capitals of those large provinces, sufficiently to provide speedily and easily all requirements for their preservation and tranquility, for which the captains-general are responsible, and to provide also a good policy and administration, the security of the persons and property of the inhabitants, the publication and due execution of the laws and orders emanating from the high government, and, generally, every wise and prudent measure demanded by the public order, the tranquility and greater prosperity of the countries intrusted to them."

See also San Pedro's Legislacion Ultramarina, vol. 1, p. 65.

And so it is that historical reviews of the Philippines, while under Spanish dominion, uniformly speak of the governors general as possessing almost absolute authority, as is illustrated by the following:

In the history by Juan Jose Delgado, chapter 17, pp. 212 et seq., which was written in 1754, it is said:

"In no kingdom or province of the Spanish crown do the viceroys or governors enjoy greater privileges, superiority and grandeur than in Filipinas. That is advisable because of the long distance from the court, and their proximity to so many kingdoms and nations, some of them civilized but others barbaric. . . . The governors of these islands are almost absolute. . . . They exercise supreme authority by reason of their charge, for receiving and sending embassies to the neighboring kings and tyrants, for sending them gifts and presents in the name of their king, and for accepting those which those kings and tyrants send them. They can make and preserve peace, declare and make war, and take vengeance on all who insult us, without awaiting any resolution from court for it. . . . Besides the above, the governors of these islands have absolute authority privately to provide and attend to all that pertains to the royal estate."

In Montero y Vidal's work, p. 162, published in 1866, this appears:

"A governor and captain-general exercises the supreme authority in Filipinas. In his charge is the direction of all civil and military matters, and even the direction of ecclesiastical matters, in so far as they touch the royal patronage. . . . The authority, then, of the governor-general, is complete."

And in the Philippine census of 1903, vol. 1, p. 364, Trinidad H. Pardo de Tavera of the Philippine Commission states that "the powers given to a governor of the Philippine Islands was practically unlimited."

Considering then that the Governor General, within the

territory committed to his charge, possessed all the powers of his master, the King, save where it was otherwise specially provided, the question whether the grant was within or in excess of the authority of the Governor General is to be determined, not by inquiring whether there was a law or order specially confiding to him the disposal of tide land, but by inquiring whether there was a law or order specially prohibiting such a disposal; that is to say, the existence of power, being usual, will be presumed, and the absence of it, being exceptional, must be shown. *United States* v. *Arredondo,* 6 Pet. 691, 728; *United States* v. *Clarke,* 8 Pet. 436, 451.

The laws and orders brought to our attention do not contain anything which, rightly considered, amounted to a prohibition of this grant. Laws 3 and 4, title 28, Partida 3, which affirm that the sea and its shore are among the things which are common to all men, are the nearest in point, but they, as interpreted by the Supreme Judicial Tribunal of Spain, were not to be taken literally and did not forbid the granting of tide land for purposes of reclamation and improvement.

What has been said sufficiently shows that the grant was made upon adequate authority, but there are other considerations which enforce this conclusion. The Spanish authorities at Manila, although familiar with what was done and claimed under the grant, and although in a position to know and enforce the law applicable to it, did not call it in question at any time during the thirty-nine years of Spanish dominion after it was made, but, on the contrary, treated it as valid by imposing taxes upon the land as private property. This is persuasive proof that in making the grant the Governor General did not exceed his authority. Besides, it must be presumed, there being no showing to the contrary, that he reported the grant to his superiors at Madrid, as was required by the royal order of January 4, 1856 (San Pedro's Legislacion Ultramarina,

vol. 1, p. 75), and therefore the fact that the grant went unchallenged, as it did, dispels all doubt of his authority.

Next to be considered is the contention, advanced by the Insular Government and the city of Manila, that the grant was made upon condition that the land be reclaimed from the sea and that "all title thereunder is defeated," because part of the land has not as yet been reclaimed. The granting words, "is granted the possession and ownership," are plain and import a present and immediate transfer of the ownership of all the land. There are no words of exception, nor any which purport to postpone the transfer until a later time. And while it clearly is contemplated that the land is to be reclaimed, there is no language which fixes a time for beginning or completing that work. Nor is the contemplated reclamation treated as the sole inducement to the grant, for it recites that it is made in consideration, *inter alia*, of "the official and industrial merits of the said Don Jose Camps and the offer of protection stated" in a prior decree. Thus, upon a survey of the grant, it is manifest that there was no express condition, either precedent or subsequent, that the land be reclaimed within any period of time. Of course, it was for the Governor General to judge of the restrictions to be imposed. He could have designated a time within which the reclamation should be effected, and could have made compliance with that requirement a condition, either precedent or subsequent. Or, if to him it seemed wise, he could have left the grantee free to effect the reclamation at such time as to the latter might seem practicable and advantageous, considering the cost of the undertaking, the means at hand for completing it, and the benefits to be derived from it. But the Governor General did not expressly adopt either of these alternatives. On the contrary, his will and purpose in that regard were expressed with such uncertainty that they could be determined only by resorting to interpretation. But that uncertainty was

effectually eliminated before the termination of Spanish dominion in the Philippines.   During the many intervening years the parties concerned, that is to say, the representatives of Spain and those claiming under the grant, pursued a course of action, heretofore described, which admits of no other conclusion than they concurred in treating the grant as embodying the latter of the two alternatives suggested.   In that way a practical interpretation was given to the grant by those who were authorized to interpret it, and full effect must be given to that interpretation now.

It follows that the contention last stated must be rejected and that the petitioner's contention that registration should have been allowed of the entire tract, including the part not as yet reclaimed, must be sustained.

The parties, being in doubt whether they should invoke our appellate jurisdiction in cases such as this by writ of error or by appeal, resorted to both methods.   Since then it has been settled that the appropriate method is by writ of error.   *Cariño* v. *Insular Government*, 212 U. S. 449, 456; *Tiglao* v. *Insular Government*, 215 U. S. 410, 414.

> *The appeals are dismissed and the judgment of the Supreme Court of the Philippines is reversed and the cause is remanded to that court with a direction to reverse the judgment of the Court of Land Registration and remand that cause to the court with a direction to allow registration of the entire tract as prayed in the petition.*