# IN THE MATTER OF THE PETITION OF THE TERRITORY OF HAWAII TO REGISTER AND CONFIRM ITS TITLE TO THE AHUPUAA OF KIOLOKU IN THE DISTRICT OF KAU, ISLAND AND COUNTY OF HAWAII, TERRITORY OF HAWAII.

## No. 1212.

ERROR TO JUDGE OF THE LAND COURT.
HON. J. T. DeBOLT, JUDGE.

ARGUED JANUARY 28, 1920.                   DECIDED MARCH 15, 1920.

COKE, C. J., KEMP AND EDINGS, JJ.

REAL ACTIONS—*statute of limitations distinguished from the common law presumption of a lost grant.*

There is a marked difference between a title acquired by prescription under the statute of limitations and a title acquired through the medium of the common law presumption of a lost grant.

SAME—*same.*

Under the statute of limitations the rule is an arbitrary one and the presumption is conclusive, whereas the common law presumption is rebuttable.

SAME—*same.*

The statute of limitations cannot be invoked against the State but where sufficient facts are shown the common law presumption of a lost grant may be indulged in and the rule will be applied as a *presumptio juris et de jure* even as against the State.

SAME—*common law presumption of a lost grant.*

Where the evidence is sufficient to apply the common law presumption of a grant it may also be assumed in the absence of circumstances repelling such conclusion that all that might lawfully have been done to perfect the legal title was in fact done and in the form prescribed by law.

SAME—*same.*

> The doctrine of the common law presumption of a lost grant
> may be invoked in favor of the State as well as against it.

## OPINION OF THE COURT BY COKE, C. J.

This cause is brought here on a writ of error sued out
by the Territory of Hawaii to review numerous rulings
of the judge of the land court of the Territory of Hawaii
made during the trial of said cause as well as the final
decision and decree made and rendered therein. There
are in all twenty-five specifications of error. The con-
troversy is in respect to what is known as the ahupuaa of
Kioloku, district of Kau, Island of Hawaii. This ahupuaa
contains an area of about 850 acres. In August, 1913, the
Territory of Hawaii sought to have its title thereto regis-
tered. After a report by the examiner which was favor-
able to the claim of the Territory notice was served upon
adjoining owners and possible claimants as provided by
law. The Hutchinson Sugar Plantation Company (here-
after referred to as the company), the present defendant
in error, was the only party appearing to make claim to
the property in question. It interposed an answer deny-
ing title in the Territory and asserted ownership of the
land in fee simple in itself. Trial of the issue thus joined
was not commenced until October, 1918.

It is the claim of the Territory that the ahupuaa of
Kioloku was not included in the great mahele of 1848 by
which the lands of the Kingdom of Hawaii were supposed
to have been partitioned and set apart in severalty to and
between the king, the chiefs and the government, respec-
tively, nor has the government by any subsequent award
or grant conveyed away its title in said ahupuaa. The
company asserts title in fee simple in itself under a ma-
hele and land commission award which cannot now be pro-
duced and of which no present record can be found but
which it claims must be presumed to have been made to

the high chiefess Ane Keohokalole and invokes the common law presumption of a grant and attempts to establish its claim of the existence of the grant by secondary evidence.

The facts involved in the controversy are simple. The predominant question is whether under the facts and circumstances shown to exist by the record a grant from the government to Ane Keohokalole can properly be presumed. As aptly said in the brief of the attorney general: "The whole issue of the case may be summarized in the one question, namely, under the facts and circumstances as shown in the case, will the court presume a grant of Kioloku to Ane Keohokalole?" The judge of the land court found after an able and exhaustive review of the evidence as well as of the authorities that a grant from the government to the company's predecessor in interest must be presumed and that the petitioner, the Territory of Hawaii, had no right, title nor interest whatsoever in or to Kioloku and thereupon dismissed the petition of the Territory.

At the trial before the land court it was established either by evidence or the admission of the parties that Caezar Kapaakea was the father and Ane Keohokalole the mother of David Kalakaua (afterwards King Kalakaua) ; that as far back as 1861 Ane Keohokalole, through her trustee C. R. Bishop, was collecting rents from the ahupuaa of Kioloku; that Ane Keohokalole died in 1869 leaving surviving her David Kalakaua and three other children; that in 1870 the lands of Ane Keohokalole were partitioned and divided between her children by a deed of partition duly executed and recorded and that by this deed the ahupuaa of Kioloku was set apart to and as the sole property of David Kalakaua; that from that date to the present time Kalakaua and his successors in interest have held actual, open, continuous and uninterrupted possession of the land in question, using it for such purposes as

it was adapted, and that the Hutchinson Sugar Plantation
Company succeeded to the rights of Kalakaua by several
mesne conveyances. The petitioner has also admitted that
the land has been assessed by the several governments of
Hawaii, to wit, the Monarchy, the Provisional Govern-
ment, the Republic of Hawaii and the 'Territory of Ha-
waii, and the taxes so assessed have been paid by the suc-
cessive occupants since 1870 to the present time.

The record herein further discloses that in 1873 David
Kalakaua presented a petition to Rufus A. Lyman, bound-
ary commissioner for the Island of Hawaii, to have the
boundaries of the ahupuaa of Kioloku and other lands
settled and adjudicated. It appears from the record of
the boundary commissioner that the owners of adjoining
lands were notified of the proceedings as required by law
and that in response to this notice the then reigning mon-
arch of Hawaii, His Majesty King Lunalilo, owner of one
of the adjoining tracts of land, appeared and was repre-
sented by J. G. Hoapili, and that the government, the
owner of one of the adjoining tracts of land, appeared
and was represented by W. T. Martin; that testimony
was taken and a judgment defining the boundaries of Kio-
loku by a survey description was entered; that no objec-
tion was made to the proceedings or to the findings of the
commissioner either by King Lunalilo or by the govern-
ment. From ancient maps and surveys of lands adjoining
Kioloku and of a small kuleana located within the bound-
aries of Kioloku as early as 1852 Kioloku was referred to
as konohiki land. Konohiki, when used as a noun, desig-
nated the person having charge of the land in behalf of
the king or chief or other person to whom the ahupuaa
had been assigned or awarded, but the word "konohiki"
is in common use as an adjective denoting land which is
privately owned in contradistinction to "aupuni" or gov-
ernment land. The classification of the lands in these

islands which has been in vogue since the great mahele of 1848 is (1) government land; (2) crown land; (3) kono-hiki land, and (4) kuleanas of the common people. In royal patent grants issued about 1860 the ahupuaa of Kio-loku was referred to simply as "Kioloku" while other lands in that vicinity which it is conceded were government lands were referred to as "aupuni."

Mr. Kanakanui, a witness for the government, testified to having searched the records of the land commission and of the privy council of the former Kingdom, as well as the records of the mahele of 1848, without being able to locate any record of an award or mahele of Kioloku. And it is further shown by the Territory that Kalakaua in his petition filed with the boundary commissioner of the Island of Hawaii to have the boundaries of Kioloku and other ahupuaas adjudicated represented that no award of Kioloku had ever been made to his mother Ane Keoho-kalole. The petition referred to is as follows:

"To the Honorable Rufus A.. Lyman,
"Commissioner of Boundaries,
"Island of Hawaii.

"The undersigned states, that A. Keohokalole had lands, She did not receive awards from the Land Commissioner to some of her lands; but she still holds said Ahupuaas to this time,

"Therefore, herewith apply to settle the boundaries of said lands, according to their names hereunder, thus

|    | Ahupuaas | District | Island |
|----|----------|----------|--------|
| 1. | Lililoa | Puna | Hawaii |
| 2. | Nalua | Kau | " |
| 3. | Kamakamaka | " | " |
| 4. | Kapauku 5 | " | " |
| 5. | Mohokea | " | " |
| 6. | Kioloku | " | " |
| 7. | Ilikahi | Kona | " |

"Property owners adjoining these lands be also called

to appear on the day set for action on these lands, before the Land Commission,

"Applicant

(Sgd.) "D. KALAKAUA.

"Honolulu, June 23rd, 1873."

No living witness has been produced who was present at the proceedings before the boundary commissioner and while the statement of Kalakaua in his petition was weighty evidence supporting the claim that no award of Kioloku had been issued to his mother yet the proceedings had upon the petition before the commissioner strongly refute that assumption. Kalakaua could only have presented and sustained his petition upon the hypothesis that Kioloku had been awarded by the land commissioners or patented or deeded by the king without defined boundaries and that petitioner was at that time the owner of the land, for it was prescribed in the law authorizing the proceedings, to wit, the act of the legislative assembly of the Kingdom approved June 22, 1866, that "All owners of ahupuaas and ilis of land within this Kingdom, whose lands have not been awarded by the land commissioners, patented or conveyed by deed from His Majesty the king, by boundaries decided in such award, patent or deed, are hereby required within five years from the 23d day of August, A. D., 1868, to file with the commissioner of boundaries for the circuit in which the land is situated, an application to have the boundaries of said land decided and certified to by said commissioner," etc. (See also *Re Boundaries of Paunau,* 24 Haw. 546), and therefore great probative force must be attached to the facts that both the king and the government although being represented at the hearing before the boundary commissioner neither interposed any objection thereto and the hearing proceeded to final determination. What took place before the boundary commissioner was entirely inconsist-

ent with any other theory than that Kalakaua was recognized by the boundary commissioner, the king and the government as the rightful owner of the property. It is worthy of mention here that of all the lands designated in Kalakaua's petition only the boundaries of Kioloku were adjudicated. Why were not the boundaries of Lililoa, Nalua, Kamakamaka, Kapauku 5, Mohokea and Ilikahi also determined? The answer is not difficult in the light of the fact that these last mentioned ahupuaas are shown not to have been the property of Kalakaua. It does not seem unreasonable to assume that these facts were known at the time to the commissioner and those concerned in the proceedings had before him and hence the boundaries of only the property owned by Kalakaua were determined. For it is a fact of record that the boundary commissioner adjudicated the boundaries of Kioloku and issued his certificate thereof to Kalakaua.

The fact that Mr. Kanakanui's search has revealed the existence of no record of an award of Kioloku taken together with the recitation contained in the petition of Kalakaua constitutes the strongest circumstances in the case of the Territory. This evidence, weighty as it may seem, appears to be overcome by other facts forming a combination of circumstances which irresistibly lead to the conclusion that Kioloku had been awarded to Ane Keohokalole, namely, the facts that she was exercising dominion over this property as early as 1861; that in the partition deed of 1870 this land was set apart to Kalakaua and in 1873 the boundaries were settled upon his application with the knowledge and acquiescence of the king and the government; that from 1870 down to 1913, a period of forty-three years, the several successive governments of Hawaii recognized Kioloku as the property of Kalakaua and his successors in interest; that during this entire period no claim whatsoever was asserted by the government or by

any representative thereof to Kioloku, and during the whole period the property was assessed as the property of Kalakaua and his successors in interest and taxes were collected by the government down to the date of the institution of this proceeding. As said in *Jover* v. *Insular Government*, 221 U. S. 623, we would not be justified in assuming that the State would collect taxes on its own property.

Each party has introduced evidence supporting its theory of the case and in this respect there is some conflict in the testimony. The rule is that the findings of the trial judge will not be disturbed by review on writ of error where to do so this court would be called upon to pass upon the credibility of the witnesses or the weight of the evidence. (Sec. 2522 R. L. 1915 as amended by Act 44 S. L. 1919; *Akatsuka* v. *McKay*, 24 Haw. 600, 604; *Kaleiheana* v. *Keahipaka*, 23 Haw. 169, 171.) The evidence introduced on behalf of the company we deem to be sufficient to sustain the judge of the land court in presuming that a grant of Kioloku was issued to Ane Keohokalole the grant itself having been lost or for other reasons cannot now be produced.

We will now direct ourselves to the law involved to the end that it may be determined whether in this jurisdiction the common law presumption of a lost grant may be indulged in as against the government. This is the vital issue and presents a question of law never heretofore dealt with by the courts of these Islands.

The doctrine of presumptions, upon which this case must be solved, has called forth various definitions. The Supreme Court of the United States gives the following definition: "A presumption is an inference as to the existence of a fact not actually known arising from its usual connection with another which is known." Blackstone in speaking of the nature of evidence required to establish a

presumption says: "Positive proof is always required where from the nature of the case it appears it might possibly have been had. But next to positive proof, circumstantial evidence, or the doctrine of presumptions, must take its place. For when the fact itself cannot demonstratively be evinced, that which comes nearest to the proof of the fact is the proof of such circumstances as either necessarily or usually attend such facts; and these are called presumptions which are only to be relied upon until the contrary be actually proved." A presumption may be defined as the probable inference which common sense, enlightened by human knowledge and experience, draws from the connection, relation and coincidences of facts and circumstances with each other. When a fact shown in evidence necessarily accompanies the fact in issue it gives rise to a strong presumption as to the existence of the fact to be proved. But if on the other hand the fact shown in evidence only usually accompanies the fact in issue it gives rise merely to a probable presumption of the existence of the fact to be proved. And Greenleaf in his work on evidence (16th ed.), section 45, in applying the doctrine of presumption to a grant as against the sovereign, lays down the rule that "though lapse of time does not of itself furnish a conclusive legal bar to the title of the sovereign, agreeably to the maxim *nullum tempus occurrit regi*,' yet if the adverse claim could have had a legal commencement, juries are instructed or advised to presume such commencement after many years of uninterrupted adverse possession or enjoyment;" and in a note to the section quoted it is said that application of the presumption to cases where a grant was implied against the sovereign has been made in a number of cases cited and that the same principle has been upheld in the United States in favor of individuals as against the State.

Lord Coke recognized the existence of the principle and

recites that an act of parliament, a grant from the crown, a deed, and in fact anything which will quiet possession may be presumed from length of time when such act, grant or deed would have been lawfully possessed, made or given, and this presumption is said to be founded on the principle that the law will not presume any man's act illegal but will attribute such possession to a legal origin; that the failure to interrupt such possession by those who had the right arose from their knowledge that it was lawful in its inception and that upon principles of public policy for quieting men in their possession. (Co. Litt. 6) In the case of the *Mayor of Kingston upon Hull* v. *Horner*, Cowp. 102, it was left to the jury to presume a grant or charter from the crown of certain duties.

In order, however, to properly comprehend the principle of law involved in the case at bar it must be constantly borne in mind that there is a marked distinction between a title acquired by prescription under the statute of limitations and a title acquired through the medium of the common law presumption of a lost grant or conveyance. Confusion here is the more likely to occur because under the statute of limitations title also vests upon the presumption of a grant. (*do Rego* v. *Halama*, 24 Haw. 750; Warvelle on Ejectment, Sec. 418.) But as pointed out in 2 C. J., Sec. 650, pp. 288, 289, under the statute of limitations the rule is an arbitrary one and the presumption is conclusive, whereas the common law presumption is rebuttable. In 1 Jones on Evidence by Horwitz, Sec. 77, it is said: "The party relying on his possession may of course call to his aid the statute of limitations where it is applicable and if he relies upon the statute the proofs must show compliance with its provisions. But the statute of limitations does not supersede the common law presumption, and if this is relied upon possession for less than a period prescribed by the statute may with other cogent circum-

stances sustain the claim of conveyance or a lost grant. The length of time which brings a given case within the legal presumption of a grant or charter to validate a right long enjoyed is not defined but depends upon its peculiar circumstances. It may be necessary to seek the aid of this presumption in some cases where the statute of limitations does not apply, as where it is urged against the State."

Counsel for the Territory relies largely upon the decisions of this court in *Kahoomana* v. *Minister of the Interior,* 3 Haw. 635, and *Thurston* v. *Bishop,* 7 Haw. 421. But in these two cases as well as in *Minister of the Interior* v. *Parke,* 4 Haw. 366 and *Kunewa* v. *Kaanaana,* 18 Haw. 252, this court was merely construing the principles involved in the application of the statute of limitations. In the *Kahoomana* case this court said : "The theory of titles by prescription is, that the holding possession of an estate openly and adversely for a certain length of time creates an inference that there was a grant from the adverse claimant or his ancestors or grantors, and the statute of limitations forbids the adverse claimant from setting up against this long continued possession the fact that there was no grant. But as against the government a grant cannot be presumed or inferred from long possession in view of the law which required claimants to land to present their claims to the land commission for confirmation or rejection." It is plainly to be seen that the court here was dealing with the law applicable to the statute of limitations and the common law presumption of a lost grant was not involved in the case. The same might also be said of *Thurston* v. *Bishop,* for it is recited in the opinion in that case, "It is admitted by the defense that no claim for this land on behalf of Lot Kamehameha was presented to the land commission according to law." Of course the presumption of a lost grant could not have been involved in the face of that admission.

One of the earliest American cases wherein the rule was adverted to and *Kingston upon Hull* v. *Horner, supra,* was quoted with approval is *Jackson* v. *M'Call,* 10 Johns. Rep. 376, delivered by the supreme court of New York in 1813. See also *White* v. *Loring,* 24 Pick. 319, decided by the supreme court of Massachusetts in 1836. The principle was considered at length by the supreme court of Vermont in *University of Vermont* v. *Reynolds' Ex'r.,* 3 Vt. 542. We quote from that opinion: "A great variety of cases were read at the argument, and the elementary treatises are full of them, to show that a grant or the extinguishment or surrender of a grant, and, in short, everything which will confirm a long continued possession, may be presumed; and this not because it is necessary to believe that any such acts were actually done or executed but for the purpose of quieting possession. In cases of prescription this possession is conclusive as to the right. Certain facts being found to exist the right is confirmed as a matter of law and the possession is considered as conclusive of the right, as if a deed or charter was actually produced. There are certain other cases in which the presumption is not considered as altogether a legal inference but must be made by the jury, and yet the court advise or direct the jury to make such presumption. The enjoyment of certain incorporeal hereditaments for the period of twenty years, if adverse, establishes the right to such enjoyment founded on the presumption of a lost grant; but this possession is liable to be explained. The enjoyment is therefore not an absolute title but may be rebutted. But if the enjoyment was adverse it affords sufficient ground for such presumption. Chancellor Kent says the later English authorities give to this presumption the most unshaken stability and they say it is conclusive evidence of right. Judge Story, in the case of *Tyler* v. *Wilkinson,* considers it in this light and says that this presumption may go to the extinguish-

ment of a right in various ways as well as by grant. * * *
Thus a grant of land may be presumed as well as a grant
of a fishery or common or way, and many cases of this
kind are to be found. * * * From comparing these cases
* * * it may be inferred that where there has been a long
continued possession which in its origin was or would
have been unlawful unless there had been a grant; or if the
origin of such possession cannot be accounted for without
considering it either as unlawful or also lawful by virtue
of a grant the court will not infer that the possession was
unlawful but direct the jury to presume such grant or any-
thing which will confirm the possession. But if the orig-
inal possession was consistent with the fact of there having
been no grant, then although the possession may have been
ever so long it will be left to a jury to say whether they
believe such grant has been made and they must determine
according to the weight of the evidence. * * * And where
there has been a settlement and a possession for a long
time, although no other grant or charter is produced under
which such settlement and possession commenced, it may
and ought to be presumed that the charter under which no
claim had been asserted had been abandoned or surren-
dered and either an antecedent or subsequent grant made
to the inhabitants who are in the actual occupancy of their
lands." The common law presumption is one of policy as
well as of convenience and necessary for the peace and
security of society. (*Fletcher* v. *Fuller,* 120 U. S. 534.)
It will be sufficient ground for the presumption to show
that by legal possibility a grant might have issued, and
this appearing it may be assumed in the absence of circum-
stances repelling such conclusion that all that might law-
fully have been done to perfect the legal title was in fact
done and in the form prescribed by law." *Williams* v.
*Donell,* 2 Head 695, quoted with approval in *Fletcher* v.
*Fuller, supra.* Here it may be mentioned that the presump-

tion may be invoked in favor of the State as well as against it. *Nelson* v. *Fleming*, 56 Ind. 310, 322.

The doctrine of the common law presumption of a grant as against the sovereign was dealt with at length by the Supreme Court of the United States in *United States* v. *Chaves*, 159 U. S. 452, and again in *United States* v. *Chaves*, 175 U. S. 509. In the *Chaves* case the court said: "The principle upon which this doctrine rests is one of general jurisprudence and is recognized in the Roman law and the codes founded thereon. * * * It is the general rule of American law that a grant will be presumed upon proof of an adverse, exclusive and uninterrupted possession for twenty years, and that such rule will be applied as a *presumptio juris et de jure* whenever by possibility a right may be acquired in any manner known to the law. * * * Nothing, it is true, can be claimed by prescription which owes its origin to, and can only be had by, matter of record; but lapse of time, accompanied by acts done or other circumstances, may warrant the jury in presuming a grant or title by record. Thus also, though lapse of time does not of itself furnish a conclusive bar to the title of the sovereign, agreeably to the maxim *nullum tempus occurrit regi,* yet if the adverse claim could have had a legal commencement, juries are advised or instructed to presume such commencement after many years of uninterrupted possession or enjoyment. Accordingly royal grants have been thus found by the jury, after an indefinitely long continued peaceful enjoyment accompanied by the usual acts of ownership." In the *Chavez* case two cases were covered in the one opinion, the same being cases Nos. 38 and 39. Referring to case No. 39 the court said: "The archives referred to and the documentary evidence are the same as in No. 38, except there is no grant." The opinion then proceeded to deal mainly with the principle involved in case No. 39. The land involved is situated in New Mexico

and the petitioner claimed ownership through the medium
of a lost Mexican grant issued long prior to the cession of
the territory embracing New Mexico to the United States
by Mexico by virtue of the treaty of Guadalupe Hidalgo in
1848. No original grant nor any record thereof could be
produced. The opinion then proceeds: "Upon a long and
uninterrupted possession the law bases presumptions as
sufficient for legal judgment in the absence of rebutting
circumstances, as formal instruments or records of articu-
late testimony. Not that formal instruments or records
are unnecessary, but it will be presumed that they once
existed and have been lost. The inquiry then recurs, do
such presumptions arise in this case and do they solve its
questions? * * * We think there can be but one conclu-
sion in this case. The possession of the land began in
wrong or began in right. If in wrong it must be shown.
The maxims of the law declare the other way. * * * Back
to Clement Gutierrez, therefore, a continuous possession
is established by admission and by testimony not contra-
dicted. Back beyond the period of living memory and be-
yond that period the title needs no inquiry for its validity
and repose." In *United States* v. *Pendell*, 185 U. S. 189,
the *Chaves* and the *Chavez* cases are cited with approval,
the court further saying: "The evidence is sufficient not
only to presume a grant but to presume any other matter
which would have occurred in order to render the grant a
perfectly valid one."

The principle involved was, therefore, recognized and
applied in England as early as the time of Lord Coke. It
has found ingraftment into the Roman civil law. It has
had the repeated sanction of the Supreme Court of the
United States as well as of the state courts and at no time
has it been repudiated by the courts of Hawaii. Hence it
must be considered the law of the land.

We have examined all of the assignments of error and

find none of them sustained by the record.    The decree below is affirmed.

*J. Lightfoot,* First Deputy Attorney General, for plaintiff in error.

*A. G. M. Robertson* (*Robertson & Olson* on the brief) for defendant in error.