KOHALA CORPORATION, Plaintiff-Appellant, *v.* STATE OF HAWAII, Defendant-Appellee, and ELENA CALLISH, J.P. HANNIGAN, KATHLEEN SPINOSA, EDWARD ASEGUT (aka FREDERICK G. PADEKEN), ALVAN C. STEARNS, RUTH M. STEARNS, HIRAM RAYMOND, SALIS ROSE RAYMOND, KEHENA BEACH, INC., RICHARD SMART, UNITED STATES OF AMERICA, COUNTY OF HAWAII, UNITED STATES OF AMERICA COAST GUARD, SEYMOUR SHINGLE, COMTEC, INC., ALICIA SHINGLE KING, WALTER S. SHINGLE, STATE OF HAWAII BOARD OF LAND AND NATURAL RESOURCES, HAWAIIAN HOLIDAY MACADAMIA NUT CO., INC., their heirs, devisees, grantees or other successors in interest, JOHN DOES 1 through 100, all unknown persons having or claiming to have any legal or equitable interest in the land at North Kohala, Hawaii, described in Exhibit "A" to the complaint filed in the above entitled cause, and ALL WHOM IT MAY CONCERN, Defendants

NO. 11088

(CIVIL NO. 5467)

FEBRUARY 18, 1987

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY PADGETT, J.

Appellant brought an action in the Third Circuit Court to quiet title to certain lands located in the District of Kohala on the Island of Hawaii. The court below, in paragraphs 2 and 3 of its judgment, awarded the land of Mahukona I to the State. Appellant appeals that award. We reverse and remand for further proceedings.

At issue here is whether appellant has title to lands in the ahupua'a of Mahukona I and the amount of such lands. Although extensive testimony with respect to the various documents in evidence was had, there is little or no dispute as to what the documents show.

On the fourth day of January, 1848, Mataio Kekuanaoa, father of the Princess Ruth Keelikolani, filed Land Commission Application 7716, claiming for her 12 lands by name, including the ahupua'a of Mahukona with the notation "koe ke awa" or "excepting the harbor." On January 28, 1848, in the Mahele book, King Kamehameha III, granted to the Princess Ruth the ahupua'a of Mahukona "awa koe i ke Lii" or "harbor to remain with the King" and Princess Ruth granted to the King that portion of Mahukona described as "awa a me kahi honua i kai" or "harbor and also land by the sea." The March 8, 1848 book listing government lands, Mahele, contains the following description under the heading "Na Aina o ke Aupuni" or "The lands of the government", "Mahukona awa a me kahi honua i kai" or "Mahukona harbor and also land by the sea," noting on the opposite page that the grant was from Princess Ruth.

The Privy Council minute book for the period July 1, 1847 to September 30, 1850 notes that on July 13, 1850 a number of the chiefs made proposals with respect to commutation for the properties granted them in the Mahele. The minutes say that the Princess' proposition was to keep eight lands and give up three. Subsequently, the land commission awarded the other 11 of the 12 lands named in Application 7716 to Princess Ruth and she subsequently kept eight and gave up three of those lands. There is no record of any action taken on her application for Mahukona I. A listing of

the lands retained and given up is contained in a document purporting to be a copy of certain Privy Council minutes. The portions of that document which are in Hawaiian, list by name, the eight lands retained by Princess Ruth and the three lands given up to the government by way of commutation as its third. Mahukona does not appear on either list. The document contains a note in English by Thurston, stating "they resigning to the Govt, all title to the other lands granted them in the Buke Mahele." That notation does not appear in the copies of the Privy Council minutes which are in evidence. No land commission award and no patent with respect to Mahukona I has ever been found. The Indices to the Land Commission Awards do not list Mahukona I as government land, crown land, or as land maheled to the chiefs on which awards and/or patents were issued.[1]

On July 18, 1873, the Princess Ruth, by a deed recorded in Liber 41, Page 354, granted to A. Christiansen several parcels of land including Mahukona but excluding therefrom "koe nae ka awa a me kahi honua" meaning "excepting however the harbor and also the ground" reserved in the Mahele. That deed was a warranty deed, not a quitclaim. Appellant traces an unbroken chain of title from that time down to the present.

In 1882, Dr. James Wight, as owner of Mahukona I, title to which had come to him, from Princess Ruth, by mesne conveyances, obtained Boundary Certificate No. 146 to the land of Mahukona I. The notes establish that the witness who testified as to the boundaries, J.M. Lydgate, purported to be acting both for the owner and for the government, and an exchange of correspondence between Lydgate and the commissioner of boundaries, F.S. Lyman, reflects that the government was aware that no award had been issued for the land and that the government might have a claim upon it. Although boundary certificates must be applied for by the land owner, the certificates, when issued, of course, do not establish title. The certificate for Mahukona I was issued approximately ten months before the death of Princess Ruth.

From the time of the issuance of the certificate, various government survey maps of the Kohala area or parts thereof covering

---

[1] Mahukona I was not unique in this regard. Many other lands were also unlisted. See Acts 75 and 78, Laws of 1890.

the ahupuaʻa of Mahukona I carried the legend "(Keelikolani in mahele) Title not perfected."

It is clear, from the records, that appellant and its predecessors-in-title have maintained, under claim of title, open, notorious and continuous possession of the land in question, and have paid property taxes thereon for over 110 years. In 1922, Territory of Hawaii entered into a land exchange with the heirs of estate of James Wight, who were appellant's predecessors-in-title, by which, among other things, the State accepted a narrow strip across the land of Mahukona I from the Wight heirs. In February 1954, the Territory entered into fishing agreements with Kohala Sugar Company, one of appellant's predecessors-in-title to assure public access over private lands to fish in certain reservoirs on lands owned by Kohala Sugar Company. A portion of one of those reservoirs was located in Mahukona I.

In the mid-1960's, the State of Hawaii built a highway between Kawaihae and Hawi in North Kohala. It accepted a deed from appellant transferring a portion of Mahukona I to the State. Subsequently, it was discovered that there was a possibility of a cloud on the State's title to that land, in that F. Olga Mason, an heir of the Wight estate, had failed to transfer her interest to Kohala Corporation. The State thereupon brought an eminent domain action to condemn F. Olga Mason's interest in that portion of the highway which crossed Mahukona I, and represented to the court, in that action, that it had title from appellant.

From the documents, it is clear that the appellant, and its predecessors-in-title, and the government of the State, and its predecessors, all knew the same crucial facts about the land in question.

(1) Princess Ruth was granted Mahukona I, with the exception of the harbor and land by it, by the King, in the Mahele.

(2) There is no record of any land commission award or patent for the land, so that apparently title to the land was never perfected in the manner envisioned by various Hawaiian statutes.

(3) Possession by appellant and its predecessors has been continuous, open, and under claim of title, known to the government, at least from the time of Princess Ruth's deed in 1873, and taxes have been paid by appellant and its predecessors-in-title on the land as far back as the government records go.

(4) Despite the fact that the government knew that title to the land had not been perfected, it entered into several transactions which seemed to recognize the existence of title in appellant and its predecessors-in-title across a period of over 40 years, although, when requested, in 1945, to issue a patent, it refused, and took the position, pursuant to an opinion by Deputy Attorney General Rhoda V. Lewis, that it had no power to do so.

We do not see, on the record, any basis on which appellant's claims of estoppel and res judicata could be upheld.

Appellant's only remaining theory is that title should have been awarded to it below under the doctrine of the lost grant. Appellant asserts that its long, continued, open, known possession of the land in question under a known claim of title, together with its payment of taxes thereon, is a sufficient basis for awarding it all the land in question under the lost grant theory.

The State, on the other hand, contends that we should overrule *In re Title of Kioloku*, 25 Haw. 357 (1920), *aff'd sub. nom Territory v. Hutchinson Sugar Plantation Co.*, 272 F. 856 (9th Cir. 1921), and abandon altogether the lost grant theory because the failure of appellant's predecessors-in-title to present a claim under Act 68 of the Laws of 1892 bars appellant's claim. Alternatively, the State contends that the trial court was correct in its conclusion of law that it was necessary for the plaintiff to have shown "affirmative government action transferring the property at the time when an award or grant could have been made" and that therefore it should have title to all the land in question. We agree with neither party.

In a dictum in *State v. Midkiff*, 49 Haw. 456, 487, 421 P.2d 550 (1966), Justice Rhoda V. Lewis, writing for the court, said:

> The "lost grant" doctrine, while adopted in the *Kioloku* case, *supra*, represents a fiction which this court is reluctant to apply here. It is a doctrine that perhaps requires re-examination.

In another dictum in *State v. Zimring*, 58 Haw. 106, 114, 566 P.2d 725 (1977), Chief Justice Richardson, writing for the court, said:

> To establish legally cognizable private title to land in the great majority of cases, one must show that he or a predecessor-in-interest acquired a Land Commission Award, a Royal Patent, a Kamehameha Deed, a Grant, a Royal Patent grant, or other government grant for the land in question. . . . Such award can be demonstrated by either the document itself or through the

application of the "presumption of a lost grant". *In re Title of Kioloku,* 25 Haw. 357 (1920); *United States v. Fullard-Leo,* 331 U.S. 256 (1947).

*United States v. Fullard-Leo,* 331 U.S. 256, 67 S.Ct. 1287, 91 L.Ed. 1474 (1947), was a contest between the United States, as successor to the Territory of Hawaii, and private owners over the title to the atoll of Palmyra. The Privy Council minutes for February 26, 1862 contain the following:

"P. Kamehameha read a Representation from Z Bent & Mr Wilkinson, about the Island Palmyra, requesting that the Island should be considered a Hawaiian possession.

"After some discussion it pleased the King to direct the Minister of the Interior, to grant what the Petitioners apply for, following the precedent of the Resolution regarding the Island Cornwallis & without exceeding the same."

Pursuant thereto, the Minister of the Interior, on June 18, 1862, issued the following proclamation:

"WHEREAS, On the 15th day of April, 1862, Palmyra Island, in latitude 5° 50' North, and longitude 161° 53' West, was taken possession of, with the usual formalities, by Captain Zenas Bent, he being duly authorized to do so, in the name of Kamehameha IV, King of the Hawaiian Islands. Therefore, This is to give notice, that the said island, so taken possession of, is henceforth to be considered and respected as part of the Domain of the King of the Hawaiian Islands."

The private owners had a chain of title going back to Bent and Wilkinson, had paid taxes on the atoll and had entered into various transactions with respect to the use of the atoll. The Supreme Court of the United States discussed the federal cases dealing with the doctrine of the lost grant and referred to *Kioloku.* It stated:

*In re Title of Kioloku,* 1920, 25 Haw. 357. The tract involved in that litigation had been held in "actual, open, continuous and uninterrupted possession" since 1870. No record or evidence of a grant by any governmental authority was produced. After a discussion of several of the cases just referred to and others, it was held that the doctrine of the lost grant, in claims to land against the state, was the "law of the land" in Hawaii. On appeal, the holding was affirmed by the Circuit Court of Appeals for the Ninth Circuit. That court said:

"Under the rule of law applicable to the case, as we find it, it was not necessary that the appellee should prove the probability that a grant did in fact issue to one of its predecessors in interest. It was enough to show, as we think it was shown, that there was a legal possibility of a grant." *Territory of Hawaii v. Hutchinson Sugar Plantation Co.*, 9th Cir. 272 F. 856, 860.

*United States v. Fullard-Leo*, 331 U.S. at 274, 67 S.Ct. at 1294, 91 L.Ed. at 1486. In Palmyra, the facts demonstrated not only use of the land by the private claimants as well as payment of taxes, but that one of the private owners' predecessors-in-title had obtained a land court decree that he was the owner in fee simple in a proceeding in which Territory of Hawaii was a party, and in which its attorney general had answered for it, and disclaimed any interest in, to, or concerning the atoll. Thus there was clear evidence of governmental acquiescence, over and beyond the payment of property taxes, in private owners' claim of title. The real problem in *Fullard-Leo* was that, due to the isolation of the atoll, the private owners had not had someone physically on the atoll at all times and so there was a sharp disagreement between the majority of the court, and the dissenters, as to whether their possession had been "continuous". Palmyra, of course, did not involve land which was owned by the King at the time of the Mahele.

In *Kioloku,* the record showed, above and beyond continuous, open, known possession of the land under claim of ownership, and payment of taxes, that Hutchinson Sugar Plantation's predecessor-in-interest, King Kalakaua, had filed for, and received a boundary certificate. This court found that there were

facts forming a combination of circumstances which irresistibly lead to the conclusion that Kioloku had been awarded to Ane Keahokalole, namely, the facts that she was exercising dominion over this property as early as 1861; that in the partition deed of 1870 this land was set apart to Kalakaua and in 1873 the boundaries were settled upon his application with the knowledge and acquiescence of the king and the government; that from 1870 down to 1913, a period of forty-three years, the several successive governments of Hawaii recognized Kioloku as the property of Kalakaua and his successors in interest; that during this entire period no claim whatsoever was asserted by the government or by any representative thereof to Kioloku, and during the

whole period the property was assessed as the property of Kalakaua and his successors in interest and taxes were collected by the government down to the date of the institution of this proceeding.

25 Haw. 357, 363-64.

Given the ruling in *Kioloku,* it is clear that Act 68 of the Laws of 1892 is not a bar to a claim by a landholder who can establish title under the lost grant theory.

In both *Fullard-Leo* and *Kioloku,* in addition to long possession under claim of title, and long payment of property taxes, there was substantial evidence of governmental actions indicating an acquiescence in the private party's claim of title. In neither was there a showing of "affirmative government action transferring the property at the time when an award or grant could have been made." The court below erred in imposing such a showing in this case as a prerequisite to proof of a lost grant.

We hold that the lost grant theory is a valid and continuing part of our law. But we also hold that in addition to long, continued possession under a claim of title and payment of property taxes, if assessed, there must be evidence either of an intent, on the part of the government, to grant title to the claimant, or of acquiescence, by the government, in the claim of title, in order to establish the legal possibility of a grant.

With respect to acquiescence, there is such evidence in this case, although, arguably, it is not as strong as that presented in *Fullard-Leo* and *Kioloku.* However, unlike those cases, here, there is undisputed evidence of an intent on the part of the government to grant the land, except for the harbor and an unspecified amount of land by the sea, to the Princess Ruth, appellant's predecessor-in-title.

The court below construed the Thurston note together with the Privy Council minutes of July 13, 1850, as a disclaimer or surrender of title to Mahukona by the Princess Ruth. Whether we regard that construction as a finding of fact, to be tested under the clearly erroneous standard of HRCP 52(a), 9 Wright & Miller, *Federal Practice and Procedure* § 2587 (1971); or as a conclusion of law, which can be reviewed by us *de novo, Clarkin v. Reimann,* 2 Haw. App. 618, 638 P.2d 857 (1981), it cannot be upheld.

The actual facts are clear and undisputed. Princess Ruth applied for 12 lands. She subsequently received awards for 11 of

those lands, eight of which she retained and three of which she returned to the government. There is no explanation in the records as why Mahukona I was not acted on by the land commission, or why the settlement between the government and the Princess Ruth omitted any mention of that land, when it expressly named the eight retained and three returned.

On the other hand, Princess Ruth's 1873 deed to Christiansen does shed some light on whether she had continued to claim title to Mahukona I after her settlement with the government in the 1850's. The State, regrettably, at pages 5 and 14 of its answering brief, misrepresents that conveyance as a quitclaim deed. This is a serious matter, because if the document was in fact a quitclaim deed, it would be strong evidence that Princess Ruth did not believe she had good title to Mahukona I and would be consistent with the government's theory that she relinquished her claim to that land in the settlement of the commutation problem. The document is, however, indisputably a warranty deed,[2] and it is notable that in the description of Mahukona, the Princess took care to grant and warrant the title to exactly what had been given her in the Mahele only, while she expressly excepted therefrom the harbor and land reserved in the Mahele.[3] As the documents in evidence show, and as is known in Hawaiian history, the Princess Ruth was one of the largest landholders in Hawaii, and entered into many, many transactions involving the transfers of land. That she knew the difference between a quitclaim and a warranty deed is clearly demonstrated by a comparison of the 1873 deed of Mahukona I, which we have been discussing (Ex. 30) with the 1880 deed of her interests in the Crown Lands (which she had no legal right to make) to Claus

---

[2] The documents in evidence include (1) a transmittal letter characterizing the 1873 conveyance as a warranty deed and (2) a translation of the deed itself containing an express warranty clause translated as:

"I, Ruth Keelikolani, for myself and my heirs, executors and administrators do hereby covenant with aforesaid Henry Christiansen and his heirs and assigns that I myself am possessed of this land hereby conveyed and have full power to convey unto said Henry Christiansen, and I bind myself and my heirs, executors and administrators to this sale and shall defend against all persons who may dispute it."

[3] "Koe nae ka awa a me kahi honua e like me ka mea i hookoe ia ma ka Mahele."

Spreckels (Ex. A-47). The former was an express warranty deed, the latter an express quitclaim deed only.

It is simply unbelievable that if the Princess had surrendered her claim to Mahukona at the time of the division of her lands with the government in the 1850's, she would warrant title to that land in the 1870's. The fact that she expressly excepted from the deed the harbor and land she gave back to the King on January 28, 1848, demonstrates the care she took in conveying property by warranty deed to limit her conveyance to what she owned.

We hold that appellant has established, under the lost grant doctrine, good title to the property in question, with the exception of that portion of the land not included in the Mahele grant. As to that portion, appellant has not established good title since it has not shown either intention to grant, or acquiescence in its claim, on the part of the government.

Appellant notes that what is commonly known as Mahukona harbor is not located in Mahukona I, and therefore argues that the harbor reservation in the Mahele is the result of mistake or over-caution. We cannot accept that argument. The harbor reservation appears once in the land commission application, twice in the Mahele book, once in the list of government lands, and finally in Princess Ruth's 1873 deed. The last document was executed by the Princess when she had been governess of the Island of Hawaii for nearly 20 years. The parties must have had some known physical feature of the sea in mind, understood by them, when they repeatedly used the word "awa".

As appellant notes, there is a large bay within a line drawn from Makaohule Point in Mahukona I to a point in the land of Kaona near where the Mahukona lighthouse has since been built. The reservation must have been of that portion of that bay adjoining Mahukona I, and some area of land bordering the bay in Mahukona I.

The court below held that the government had established good title to the "flatlands" in the makai portion of the property in question, comprising six to ten acres.

Given the evidence in this case, we are not satisfied that the word "honua", as used by Princess Ruth in granting the harbor and land by the sea to King, necessarily means all the flatlands next to the sea. The King's grant to her expressly reserved only the harbor.

Obviously, however, some land next to the harbor must be utilized for harbor purposes, or the reservation of a harbor is without substantial value, so there is a logical explanation for the Princess Ruth giving back not only the harbor but "a me kahi honua i kai." We are not satisfied that the record here permits a determination of what the reserved lands were. Determination of that issue should be made after the parties have had an opportunity to present any further evidence that they may be able to adduce on that issue. Thereafter an amended judgment should be entered consistent herewith.

Reversed and remanded for further proceedings.

*Wayne Nasser (Clinton R. Ashford* with him on the brief; Ashford & Wriston of counsel) for appellant.

*William M. Tam (Dona L. Hanaike* with him on the brief), Deputy Attorneys General, for appellee.