UNITED STATES *v.* FULLARD-LEO ET AL.

No. 429. Argued February 12, 1947.—Decided May 12, 1947.

258

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Bazelon, Roger P. Marquis* and *Alvin O. West.*

*A. G. M. Robertson* argued the cause and filed a brief for respondents.

*C. Nils Tavares,* Attorney General of Hawaii, filed a brief for the Territory of Hawaii, as *amicus curiae,* in support of respondents.

Mr. Justice Reed delivered the opinion of the Court.

This writ of certiorari was allowed to review a decree of the United States Circuit Court of Appeals for the Ninth Circuit affirming a decree of the District Court of the United States for the District of Hawaii, 329 U. S. 697. The United States began the present proceedings by a petition, filed in the District Court, to quiet title in it to a group of islets in the Pacific, long known as Palmyra Island. Palmyra was annexed to the Kingdom of Hawaii on February 26, 1862, and the United States claims that it remained a part of the governmental lands of Hawaii and passed to the United States by the Joint Resolution of Congress of July 7, 1898, which annexed Hawaii to the United States and accepted for the United States all public, Government or Crown lands and all other public property then belonging to the Republic of Hawaii.[1] The lands and sovereignty of the Kingdom of Hawaii previously had passed directly to the Republic of Hawaii, through the intervening Provisional Government.

Palmyra Island is around one thousand miles south of the main Hawaiian group. It is the first considerable body of land in that direction and lies between the Hawaiian Islands and Samoa. The Palmyra group is a coral covered atoll of about fifty islets, some with trees, and extends—reefs, intervening water and land—5 2/3 sea miles in an easterly and westerly direction and 1 1/3 sea miles northwardly and southwardly. The observation spot for the map in the case is Latitude 5° 52′ 18″ N., Longitude 162° 05′ 55″ W. The British islands of Washington, Fanning and Christmas lie within a 500-mile radius to the southeast of Palmyra. Use of the islands by the respondents and their predecessors in title was intermittent. The question of title became important in 1939 when Congress authorized the construction at Palmyra of naval

---

[1] *Hawaii* v. *Mankichi,* 190 U. S. 197.

aviation facilities and appropriated $1,100,000 for their construction. 53 Stat. 590. Negotiations with these respondents, as owners, were undertaken in 1938 by the Navy Department for a lease of the property but were not completed. This suit was filed in 1939.

There have been two trials of this case. The records of both are before us, as the record of the first trial was made a part of the second. Certain contemporaneous written evidence of the early transactions was produced.

The findings of fact in the first trial show that two Hawaiian citizens, Johnson Wilkinson and Zenas Bent, made a representation concerning Palmyra Island to the King and the Cabinet Council. The minutes of a meeting of the Council which took place at Honolulu on February 26, 1862, are extant. The "representation" has not been found. The Council minutes show the following:

> "P. Kamehameha read a Representation from Z Bent & Mr Wilkinson, about the Island Palmyra, requesting that the Island should be considered a Hawaiian possession & be placed under the Hawaiian Flag
>
> "After some discussion it pleased the King to direct the Minister of the Interior, to grant what the Petitioners apply for, following the precedent of the Resolution regarding the Island Cornwallis & without exceeding the same."

The action of the Council was communicated to Wilkinson and Bent through a letter by the Minister of the Interior on March 1, 1862. In the letter it was said that the Hawaiian Government consented to the taking possession of Palmyra "for the purpose of increasing the trade and commerce of this Kingdom as well as offering protection to the interests of its subjects." Accompanying the letter was a commission empowering Bent "to take possession in our name of Palmyra Island." Explicit directions were

contained in the commission that Bent was to sign a declaration and leave it in a bottle buried at the foot of a pole wrapped with the Hawaiian flag. The commission was signed jointly by the King and the Minister of Interior. On June 16, 1862, Bent reported that he had carried out the commission and left a paper as directed. In the same report Bent told of the trees on the island and the kind of vegetables that would grow. He said that he had erected a dwelling house on the island and a curing house for biche de mer, a kind of edible sea slug that is prized in the Orient. It also said that he had left five men on the island and proposed to return in about ten days. Thereupon the Minister of the Interior duly issued a proclamation on June 18, as follows:

"Whereas, On the 15th day of April, 1862, Palmyra Island, in latitude 5° 50′ North, and longitude 161° 53′ West, was taken possession of, with the usual formalities, by Captain Zenas Bent, he being duly authorized to do so, in the name of Kamehameha IV, King of the Hawaiian Islands. Therefore, This is to give notice, that the said island, so taken possession of, is henceforth to be considered and respected as part of the Domain of the King of the Hawaiian Islands."

A finding was made that certain comments on the expedition were published in the Honolulu papers between the representation to the Council and the proclamation which was only important in the present litigation as showing a contemporaneous understanding that possession was being taken of an island as part of the Domain of the King of the Hawaiian Islands.

As shown by the minutes of the Cabinet Council, the Minister of the Interior was directed to grant the application of Bent and Wilkinson "following the precedent of the Resolution regarding the Island Cornwallis & without exceeding the same." The meaning of these words is not

made clear by the record. The United States contends that the words limit any rights of Bent in Palmyra to "a five-year right to take guano," and that he never was "granted or intended to be granted a fee simple title." The trial court thought that the purpose of the Council might reasonably have been to limit the authority of Bent and Wilkinson to islands that were "not in possession of any other government or any other people." The reason for this supposition lies in the fact that the commission of May 31, 1858, to Samuel Clesson Allen, who discovered Cornwallis Island for Hawaii, to take possession of the island contained the words just quoted. On the same day that the commission was issued, a contract was made with Edward P. Adams for him to take guano for five years from any islands acquired for Hawaii by Allen in the schooner, "Kalama." Adams' request for the grant of a fee to a ⅞ interest in any island discovered, so far as shown by the record, was not acted upon by the Hawaiian legislative body.

Allen took possession of Cornwallis Island and submitted a report of his expedition on July 12, 1858, to the Minister of the Interior. Thereupon at a meeting of the Privy Council on July 27, 1858, the following resolution was passed:

> "Resolved that Cornwallis Island in latitude 16.43 North, and longitude 169.33 west from Greenwich, and Kalama Island, in latitude 16.44 North and longitude 169.21 west, having been taken possession of, with the usual formalities, on the 14th and 19th of June 1858, by Samuel C. Allen Esquire, in the name of Kamehameha IV, the said Islands are to be considered as part of His Majesty's Domain."

It will be noted that this resolution is substantially in the form of the later proclamation in regard to Palmyra.

The annexation of Cornwallis Island failed because of prior discovery by the United States and later, on October

16, 1858, the Minister of the Interior cancelled the contract which had been made with Adams.

Thus it will be seen that the meaning of the minutes concerning the acquisition of Palmyra, following the precedent of Cornwallis, is uncertain. The resolution annexing Cornwallis is substantially the same as the proclamation concerning Palmyra. The commission authorizing Bent to take possession of Palmyra is substantially the same as the commission to Allen that resulted in the discovery of Cornwallis. There is no evidence of a contract with Bent and Wilkinson similar to the guano contract made with Adams. We conclude that there is nothing in the requirement that the Palmyra acquisition should follow the precedent of the Cornwallis resolution to indicate anything more than that the sovereignty over Palmyra was to be acquired for Hawaii, as stated in the proclamation of possession. There is nothing to lead us to disagree with the trial court's finding as to Palmyra, as follows:

> "The words used in the formality of annexation and proclamation need not and likely would not have been different whether it was the intention that the act of annexion should constitute the vesting of a fee simple title to the lands in the King, or merely extend sovereignty over the domain annexed."

We find no evidence of a consistent plan or custom of the Kingdom of Hawaii relating to title to lands on islands when possession was taken for the Kingdom. The instructions to Wilkinson and Bent were:

> "I am authorized to state on the part of His Majesty's Government that they consent to the taking possession of the island of Palmyra, situated in Longitude 161° 53′ west and in Latitude 6° 4 North, as described by you in said memorial; for the purpose of increasing the trade and commerce of this Kingdom as well as offering protection to the interests of its subjects."

The trial court ended its findings of fact and conclusions of law on the first trial in these words:

"My controlling finding is, that the sovereignty of the United States was extended over Palmyra Island by Annexation, but the Republic of Hawaii did not in fact or in form assert fee simple title to this land at the time of annexation, or at any other time, and it is sufficient to say, only, as a

### Conclusion

I am decidedly of opinion that petitioner [The United States] does not exhibit a title which can be sustained in the Courts of the United States, and therefore, is not entitled to any relief prayed for."

On appeal, the Court of Appeals reversed. *United States* v. *Fullard-Leo,* 133 F. 2d 743. It concluded that the commission to Bent, heretofore referred to,

"makes it abundantly clear that Bent was merely acting as agent of the King. Under the principles of international law, the taking of possession by Bent perfected the title of the King. 1 Hyde, International Law, 167 § 100; 1 Oppenheim, International Law, 276–278, §§ 221–224; Martin v. Waddell, 16 Pet. 367, 409, 41 U. S. 367, 409, 10 L. Ed. 997. Nothing in the resolution or the letter referred to is contrary to that view." *Id.,* 747.

It said there was no proof of subsequent alienation by any sovereign and that the evidence would not support a finding of a lost grant.

On remand of this case on the first appeal, the trial court entered further findings of fact and conclusions of law. It held:

"I believe and so hold that the evidence in this case is not only entirely consistent with but can reasonably and logically be accounted for only upon the presump-

tion that a grant issued to Bent and Wilkinson by which the Hawaiian government parted with its title."

This can only mean that in the trial court's opinion, the Kingdom of Hawaii acquired sovereignty over Palmyra and Bent and Wilkinson obtained the private ownership of the islets. This holding was affirmed on appeal. *United States* v. *Fullard-Leo,* 156 F. 2d 756. Although only one of the questions presented on certiorari, our determination that the action of the Circuit Court of Appeals is correct disposes of the entire case.

Hawaii has been a territory of the United States since the Joint Resolution of Annexation of July 7, 1898. 30 Stat. 750. Before that the islands composing the present Territory of Hawaii had existed independent from the rest of the world and sovereign as far back as history and local tradition reaches.[2] When American Christian missionaries arrived at the Islands in 1820, the Hawaiian civilization merged with that of the rest of the known world. At that time the principal islands of the present Territory had been united a few years before into a monarchy under a strong leader, Kamehameha I. Notwithstanding his death, a short time before the coming of the missionaries, the kingdom welded by him from the several island communities continued as a recognized monarchy under his successors until its fall in 1893. A Provisional Government succeeded the monarchy and was in turn followed by the Republic of Hawaii, the foreign governmental authority mentioned in the Congressional Resolution of Annexation as ceding Hawaii to the United States. From Kamehameha I to annexation, Hawaii made steady advances in conforming its laws and economy to the manner of life of the other civilized nations of the world.

---

[2] *Hawaii* v. *Mankichi,* 190 U. S. 197, 216.

266

At the time of the annexation of Palmyra Island by the Kingdom of Hawaii, April 15, 1862, that monarchy possessed a system of land ownership and land laws that were adequate to establish titles and maintain a proper record thereof in accordance with the contemporaneous practices of Anglo-American law. The earlier nineteenth century laws of the Kingdom had been codified into a Civil Code in 1859. In this code the Minister of the Interior was given supervision of the public lands with power to dispose of them with the authority of the King in Cabinet Council. Civil Code of the Hawaiian Islands, 1859, c. VII, Art. I. By c. XXVI, Art. LI, a Bureau of Conveyances with books of registry was required and by c. XXV, Art. L, §§ 1241–48, provision was made for probate and administration. Under treaties with foreign nations, Hawaii permitted the sale of local lands of deceased aliens and the withdrawal of the proceeds by their heirs. *Id.,* pp. 461 and 471.

Kamehameha I, as King and Conqueror, was recognized by Hawaiian law as the sole owner of all the soil of the Islands. Through a system of feudal tenures, not too clearly defined, large portions of the royal domains were divided among the chiefs by Kamehameha I and his successors and this process of infeudation continued to the lowest class of tenants. This system of tenures created dissatisfaction among the chiefs and people because of the burdens of service and produce that the inferior owed to the superior. Consequently by a series of royal and legislative steps, the King and the House of Nobles and Representatives provided for a land system which finally resulted in a separation of the lands into lands of the Government, the Crown and the People.[3] This purpose finally

---

[3] Declaration of Rights, 1839.

Act to Organize Executive Departments and Joint Resolution, April 27, 1846, Hawaii, Statute Laws, 1845–46, vol. I, pp. 99, 277.

was manifested by the Act of June 7, 1848.[4]   By this act, much of the land of Hawaii was allocated between the Crown and the Government.   This division of lands became known as "The Great Mahele."[5]   Nothing has been called to our attention limiting the power of the King to grant Crown Lands[6] prior to the Act of January 3, 1865. Compare *Jover* v. *Insular Government*, 221 U. S. 623, 633. The requirement that the Minister of the Interior maintain a record of all royal grants refers only to those for government land.   Civil Code, 1859, § 44.   By enactment of the King and the Legislative Assembly in 1865, the Crown Lands became inalienable except by future legislative action.   See "Crown Lands," Revised Laws of Hawaii, 1905, pp. 1226–30.   The private lands of the King or Crown Lands, confirmed to him by the Act of June 7, 1848, were taken over by the Government in 1895 and thus became government lands, also.

In order to establish private title to lands in the former tenants, a Board of Commissioners to Quiet Land Titles was created in 1846.[7]   This Commission adopted "Principles" for adjudication of claims.   These were approved by the Legislative Council the same year and throw strong light on the Hawaiian land system shortly before the annexation of Palmyra.[8]   This Commission dealt not only with lands included in the Great Mahele but also with

[4] Revised Laws of Hawaii, 1905, p. 1197 *et seq.*

[5] *Thurston* v. *Bishop*, 7 Haw. 421, dissent, n. at 454.

[6] The domain covered by the term seems to be not only the lands declared to be the private lands of the King by the Act of June 7, 1848, but also other unassigned lands later declared by legislative authority to be Crown Lands.   Rev. Laws, Hawaii, 1905, p. 1227; Act of November 14, 1890, Laws, Hawaii, 1890, c. 75; Rev. Laws, Hawaii, 1905, p. 1229.

[7] Hawaii, Statute Laws, 1845–46, vol. I, p. 107.

[8] Hawaii, Statute Laws, 1847, vol. II, pp. 81–94; Revised Laws, Hawaii, 1905, p. 1164 *et seq.*

268

lands that were not mentioned in that act and established titles for such lands. It apparently continued until March 31, 1855.[9] After the end of the Commission's work, the Minister of the Interior and the King in Cabinet Council were charged May 17, 1859, with responsibility for government lands and the maintenance of records for all royal conveyances.[10] This summary of the Hawaiian land laws at the time of the annexation of Palmyra brings before us the pattern of land ownership and the system of recordation of titles, both those stemming from royal grants of government lands and from private transactions. The claim of respondents to Palmyra must be adjudicated with this situation in mind. We are not dealing with an explorer's claim of title to lands of a savage tribe or that of a discoverer of a hitherto unknown islet.

Whether we distinguish between Crown and Government lands, however, seems immaterial. No record appears of any conveyance from King or Minister to any land on Palmyra. We assume the law required a public record for any such conveyance from either from the time possession was taken for Hawaii. It is clear that both the King and the Minister of the Interior with the authority of

---

[9] *Thurston* v. *Bishop*, 7 Haw. 421, 429, 437.

"The Commission was authorized to consider possession of land acquired by oral gift of Kamehameha I., or one of his high chiefs, as sufficient evidence of title to authorize an award therefor to the claimant. This we must consider as the foundation of all titles to land in this Kingdom, except such as come from the King, to any part of his reserved lands, and excepting also the lists of Government and Fort lands reserved. The land in dispute in this case is not one of those specifically reserved by the King, Kamehameha III., to himself and his successors, and not being in the lists of lands specially set apart as Government or Fort lands, must be one of those over which the Land Commission had jurisdiction to award to the claimant." P. 429.

[10] Haw. Civil Code, 1859, p. 14 *et seq.*

the King in the Cabinet Council had power to convey the lands to private citizens.   Civil Code, 1859, §§ 39–48; Act of January 3, 1865, Rev. Laws, Hawaii, 1905, p. 1226, § 3. We assume further that the formal claim to Palmyra for the Hawaiian Kingdom made by Bent, pursuant to his commission, gave Hawaii not only sovereignty over Palmyra but also the power to grant the lands of the newly annexed islets as part of its public lands to private owners.

In the circumstances heretofore described, were the district and circuit courts justified in quieting title to Palmyra in respondents on the theory of a lost grant? We take judicial notice of the laws of Hawaii prior to its annexation as a part of our domestic laws.[11]   The rules under which the Hawaiian people lived under the monarchy or republic define, for the sovereign of today, the rights acquired during those periods.   While in matters of local law the federal courts defer to the decisions of the territorial courts,[12] we are dealing here with a problem of federal law—the United States seeks to quiet its title to land now claimed by virtue of Hawaiian cession.   The federal rights are partly dependent upon the Hawaiian law prior to annexation.   Therefore while the Hawaiian law, as it existed before the annexation of the Territory, is controlling on rights in land that are claimed to have had their beginnings then the federal courts construe that law for themselves.   The federal courts cannot be foreclosed by determinations of the Hawaiian law by the Hawaiian courts.   They will lean heavily upon the Hawaiian decisions as to the Hawaiian law but they are not bound to follow those decisions where a claimed title to public

[11] *United States* v. *Perot*, 98 U. S. 428, 430; *United States* v. *Chaves*, 159 U. S. 452, 459.

[12] *De Castro* v. *Board of Comm'rs*, 322 U. S. 451, 459; *Christy* v. *Pridgeon*, 4 Wall. 196.

lands of the United States is involved.[13]  The roots of respondents' claim spring from Hawaiian law.  As their claim to Palmyra continued after the United States acquired in 1898 whatever rights Hawaii then had, the validity of respondents' claim must be judged, also, in the light of the public land law of the United States.

The presumption of a lost grant to land has received recognition as an appropriate means to quiet long possession.  It recognizes that lapse of time may cure the neglect or failure to secure the proper muniments of title, even though the lost grant may not have been in fact executed.[14]  The doctrine first appeared in the field of incorporeal hereditaments but has been extended to realty.[15]  The rule applies to claims to land held adversely to the sovereign.[16]  The case from this Court most often cited is

[13] *Appleby* v. *City of New York,* 271 U. S. 364, 380; compare *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 366; *United States* v. *Allegheny County,* 322 U. S. 174, 183; *S. R. A., Inc.* v. *Minnesota,* 327 U. S. 558, 564.

[14] *Fletcher* v. *Fuller,* 120 U. S. 534, 545, 547; *United States* v. *Chavez,* 175 U. S. 509, 520.

[15] *Ricard* v. *Williams,* 7 Wheat. 59, 109.  See Holdsworth, A History of English Law, vol. VII, p. 343, *et seq.;* 1 Greenleaf, Evidence (12th Ed.), § 17.

[16] 1 Greenleaf, Evidence (16th Ed.), § 45a:

"Thus, also, though lapse of time does not, of itself, furnish a conclusive legal bar to the title of the sovereign, agreeably to the maxim, 'nullum tempus occurrit regi;' yet, if the adverse claim could have had a legal commencement, juries are instructed or advised to presume such commencement, after many years of uninterrupted adverse possession or enjoyment.  Accordingly, royal grants have been thus found by the jury, after an indefinitely long-continued peaceable enjoyment, accompanied by the usual acts of ownership.  So, after less than forty years' possession of a tract of land, and proof of a prior order of council for the survey of the lot, and of an actual survey thereof accordingly, it was held that the jury were properly instructed to presume that a patent had been duly issued.  In regard, however, to crown or public grants, a longer lapse of time has generally

*United States* v. *Chaves,* 159 U. S. 452. In that case, there was evidence of the prior existence of the lost grant. The title of the claimants was upheld but this Court then stated, at p. 464, conformably to *Fletcher* v. *Fuller, supra:*

> "Without going at length into the subject, it may be safely said that by the weight of authority, as well as the preponderance of opinion, it is the general rule of American law that a grant will be presumed upon proof of an adverse, exclusive, and uninterrupted possession for twenty years, and that such rule will be applied as a *presumptio juris et de jure,* wherever, by possibility, a right may be acquired in any manner known to the law."

See *United States* v. *Pendell,* 185 U. S. 189, 200–201.

A few years later, in *United States* v. *Chavez,* 175 U. S. 509, the problem of the lost grant again arose. In this case, as to one tract, case No. 38 at 516, the existence of the grant to Joaquin Sedillo was not shown except by a statement of January 11, 1734, that the tract conveyed "was acquired by his [affiant's] father in part by grant in the name of His Majesty [The King of Spain] . . ." P. 514. In referring to the recognition of title in the private owners, this Court said, at 520:

> "Succeeding to the power and obligations of those Governments, must the United States do so? This is insisted by their counsel, and yet they have felt and expressed the equities which arise from the circumstances of the case. Whence arise those equities? That which establishes them may establish title. Upon a long and uninterrupted possession, the law bases presumptions as sufficient for legal judgment,

---

been deemed necessary, in order to justify this presumption, than is considered sufficient to authorize the like presumption in the case of grants from private persons."

in the absence of rebutting circumstances, as formal instruments, or records, or articulate testimony. Not that formal instruments or records are unnecessary, but it will be presumed that they once existed and have been lost. The inquiry then recurs, do such presumptions arise in this case and do they solve its questions?"

Thereafter the Court, 524, referred to the long possession and sustained the claimants in their title.

*Cariño* v. *Insular Government*, 212 U. S. 449, was decided on a writ of error to the Supreme Court of the Philippine Islands. An Igorot chieftain sought to register his land in Benguet Province, long held by his family. Under claim of succession to the Spanish rights by the Treaty of Paris and an exception in the Act of July 1, 1902, providing for temporary administration of civil government in the Philippines,[17] the land had been taken for public purposes by the United States and the Philippine Government. Objection was made by the two governments and sustained by the Supreme Court of the Philippines on the ground that the applicant did not show a grant from any sovereign. This Court thought it unjust, in the circumstances, to require a native to have a paper title.

"It might, perhaps, be proper and sufficient to say that when, as far back as testimony or memory goes, the land has been held by individuals under a claim of private ownership, it will be presumed to have been held in the same way from before the Spanish conquest, and never to have been public land." 212 U. S. at 460.

The Philippine judgment was reversed.

The law of the Territory of Hawaii recognizes and has applied the doctrine of the lost grant in controversies between a claimant to Government land and the Territory.

[17] 32 Stat. 691, § 12.

*In re Title of Kioloku* (1920), 25 Haw. 357. The tract involved in that litigation had been held in "actual, open, continuous and uninterrupted possession" since 1870. No record or evidence of a grant by any governmental authority was produced. After a discussion of several of the cases just referred to and others, it was held that the doctrine of the lost grant, in claims to land against the state, was the "law of the land" in Hawaii. On appeal the holding was affirmed by the Circuit Court of Appeals for the Ninth Circuit. That court said:

> "Under the rule of law applicable to the case, as we find it, it was not necessary that the appellee should prove the probability that a grant did in fact issue to one of its predecessors in interest. It was enough to show, as we think it was shown, that there was a legal possibility of a grant." *Territory of Hawaii* v. *Hutchinson Sugar Plantation Co.*, 272 F. 856, 860.

We are therefore of the opinion that where, as here, there was power in the King or the officials of the Kingdom of Hawaii to convey a title to Palmyra [18] during the years immediately following its annexation to the Kingdom of Hawaii and prior to many of the private conveyances hereinafter referred to, the doctrine of a lost grant may be applied, in suitable circumstances, and its existence presumed in favor of the predecessors in title of these respondents. In order for the doctrine of a lost grant to be applicable, the possession must be under a claim of right, actual, open and exclusive.[19] A chain of conveyances is important. So is the payment of taxes.[20] A claim for government lands stands upon no different principle in

[18] 1 Greenleaf, Evidence (16th Ed.), § 45a.

[19] *Fletcher* v. *Fuller, supra,* 551; *United States* v. *Chaves, supra,* 464; *United States* v. *Chavez, supra,* 520.

[20] *Fletcher* v. *Fuller, supra,* 552; *Whitney* v. *United States,* 167 U. S. 529, 546; *Jover* v. *Insular Government, supra,* 633.

theory so long as authority exists in government officials to execute the patent, grant or conveyance. As a practical matter it requires a higher degree of proof because of the difficulty for a state to protect its lands from use by those without right. We turn then to the circumstances relied upon by the lower courts as sustaining respondents' contentions in respect to their claim to and occupation of Palmyra.

In the earlier part of this opinion, we have set out in detail the existing governmental record of the proceedings leading up to the annexation of Palmyra by the Kingdom of Hawaii in 1862. No positive evidence was produced as to any grant of Palmyra by Hawaii prior to the latter's annexation by the United States in 1898. Nor does the record show the exercise of any direct governmental authority over Palmyra. In 1905, upon a request of the Governor for an opinion concerning the jurisdiction of Hawaii over islands to the northwest of Kauai, the Attorney General answered that Hawaii had power to lease them. It will be noted from the short opinion in the margin that Palmyra, though over 1000 miles to the southeast of Kauai, was included. Nothing appears as to any former or subsequent exercise by Hawaii of a power to lease Palmyra.[21] No taxes were collected from those who

---

[21]                    "OPINION BOOK

Attorney General's Department

Pages 598–600

Opinion No. 18

Honolulu, T. H., Feb. 11, 1905

To His Excellency Geo. R. Carter,
      Governor of the Territory of Hawaii,
            Honolulu, T. H.

SIR:

In answer to your request of December 15th, 1904, for an opinion as to the jurisdiction of the Territory of Hawaii over the various small guano islands to the north-west of Kauai, I would reply as follows:

After a careful investigation of the records in the office of the Secretary of the Territory, formerly the Foreign Office, and from other

claimed to be owners prior to 1885 when the Pacific Navigation Company paid taxes to Hawaii on Palmyra for three years. Assessments have been made annually since 1911 and taxes have been paid regularly since then by the claimants to the property. At the time of annexation by

sources of information, I find that the authority of the Territory of Hawaii over these islands is as follows:

It appears in the report of J. A. King, Minister of the Interior, dated the 2nd day of June, 1894, to Sanford B. Dole, President of the Republic of Hawaii, that formal possession was taken of Necker Island by the said J. A. King, representing the Republic of Hawaii, on May 22, 1894; it also appears by that report that the government of the Hawaiian Islands had sent Captain John Paty to take possession of said island about 1857; it also appears that he did take such possession at that time.

Palmyra Island, seems to have been acquired during the reign of Kamehameha IV, by a proclamation signed by him, dated the 15th day of June, 1862.

Lisiansky Island was taken by the government of the Hawaiian Islands through Capt. John Paty on the 10th day of May, 1857.

Morell Island and Patrocinio or Byer Island were both taken for the Republic of Hawaii in 1898, by G. N. Wilcox, a Commissioner for that purpose appointed.

While I was unable to find any official records of the acquisition of the other islands, the government has, for many years, assumed jurisdiction over them. The following leases have been made, from time to time, and have been undisputed:

Lease of Necker Island, dated the 2nd day of June, 1904, to A. H. C. Lovekin, at $25.00 per annum, term twenty-five years.

Lease of J. A. King, Minister of the Interior, to the North Pacific Phosphate & Fertilizer Co. of Morell, Ocean, Pearl and Hermes reef, Midway and French Frigate Shoals, twenty-five years from the 15th day of February, 1894.

Laysan and Lisiansky Islands to G. D. Freeth, April 17th, 1893.

While it is to be regretted that the records of our foreign office are not more complete, possibly a more exhaustive search might find other documents which, in the present state of the old foreign office, it was impossible for me to find. I believe that from these records the government's right to lease the islands, or any privileges thereon, is clear; also to lease the same, as suggested in your letter. The fact of making such leases, and the lessees taking possession thereunder, recognizing the Territory of Hawaii as the landlord would be prima

the United States, provision was made for commissioners to recommend to Congress legislation concerning the Hawaiian Islands. 30 Stat. 750. A full report was made which was transmitted to Congress by the Pesident on December 6, 1898. U. S. Senate Document No. 16, 55th Cong., 3d Sess. It dealt with the Public Domain and shows that the Crown Lands had been taken over by the Hawaiian Government in 1894, p. 4 *et seq.* In 1894, the Crown Lands were in area 971,463 acres. There were no Crown Lands shown on the smaller islands. P. 102. An appendix shows the Government lands as of September 30, 1897, and lists in acres and values those of the principal islands of the group. Pp. 47–51. They amounted, in acres, to 1,744,713. In the recapitulation, though not included in the lists of public lands, there is an item that may include Palmyra. It reads, "Laysan, etc., islands, Acres ——, Value $40,000." At another point, p. 4, under "Area and Population" appears the only reference to Palmyra. The reference in its setting appears in the margin.[22]

facie evidence in international law of our right to the same and would be the best evidence the government could make of its claim to the various islands in question.

Yours truly,<br>(Sgd) LORRIN ANDREWS<br>Attorney General."

[22] S. Doc. No. 16, 55th Cong., 3d Sess., p. 4:

"The Hawaiian group numbers seven inhabited islands and eleven or twelve small rocky or sandy shoals or reefs, with a total area of 6,740 square miles. They are described as follows:

| | Population, 1896. |
|---|---|
| Hawaii, area 4,210 square miles | 33, 285 |
| Maui, 760 square miles | 17, 726 |
| Oahu, 600 square miles | 40, 205 |
| Kauai, 590 square miles (rich farming and grazing lands) | 15, 228 |
| Molokai, 270 square miles (agricultural and grazing) | 2, 307 |
| Lanai, 150 square miles (devoted to sheep raising) | 105 |
| Niihau, 97 square miles (leased to sheep raisers) | 164 |

Respondents' claim of title exists in a consistent series of transactions beginning in 1862 with a deed to Wilkinson from Bent. The deed was recorded in the Registry of Conveyances of Hawaii in 1885. It conveyed all Bent's "right, title and interest in and to all the property of whatever description now lying or situated on Palmyra Island in the Pacific Ocean which Island by a proclamation of His Majesty Kamehameha IV at present belongs to the Hawaiian Kingdom. And also all my right, title and interest in and to any partnership property that I may have an interest in as co-partner with the said Johnson Wilkinson." The language, we think, is consistent with an intention to convey a claimed interest in the realty "lying or situated on Palmyra Island" as well as any partnership personal property. Thereafter Wilkinson died in New Zealand in 1866 and left a will devising to his wife, Kalama:

"And also all my landed freehold and leasehold Estates in the Province of Auckland aforesaid, at Hono-

---

Kahoolawe, 63 square miles.

Molokini, small size.

Lehua, small size.

Nihoa, 500 acres (about), precipitous rock, 400 feet high (244 miles northwest from Honolulu).

Laysan, 2,000 acres (about), guano island, low and sandy, 30 feet high (800 miles northwest from Honolulu).

Gardeners Island, two inaccessible rocks, 200 feet high, about 1,000 feet long (607 miles northwest of Honolulu).

Liscansky Island, 500 acres (about), low and sandy, 25 to 50 feet high (920 miles northwest from Honolulu).

Ocean Island, 500 acres (about), low and sandy (1,800 miles northwest from Honolulu).

Necker Island, 400 acres (about), a precipitous rock, 300 feet high (400 miles northwest from Honolulu).

Palmyra Island, a cluster of low islets, about 10 miles in circumference, with lagoon in center; has a few cocoanut trees (1,100 miles southwest of Honolulu).

Kaula, small, rocky island, a few miles southwest of Niihau.

French Frigate Shoal, scattered shoals or reefs."

lulu in the Sandwich Islands in the Island of Palmyra in the South Sea Islands and wheresoever the same may be situated and whether in the said Colony of New Zealand or elsewhere To hold suach real and personal estate unto the said Kalama absolutely and forever."

The will was proven and registered in New Zealand and was later admitted to probate in Hawaii in 1898. In 1885, after the death of Kalama, two of her heirs transferred all their "right, title and interest as heirs at law of the said Kalama or otherwise, in and to the Island of Palmyra" to one Wilcox, who conveyed to the Pacific Navigation Company. By a series of some four mesne conveyances between 1888 and 1911 the interest of Pacific Navigation Company in the island was eventually transferred to one Henry Cooper. A third heir of Kalama's transferred his rights in the island to one Ringer, whose children transferred their rights in the Island to Henry Cooper in 1912. Ringer's widow in 1912 sold all her right, title, and interest in the island to Maui and Clarke.

In 1912 Cooper petitioned the Land Court of Hawaii to confirm title in him. Maui and Clarke contested the petition, claiming to own a dower interest in an "undivided one-third of the Island." Through its Attorney General, the Territory of Hawaii answered the petition and disclaimed "any interest in, to or concerning" Palmyra. The court decreed that Cooper was the owner in fee simple of the island subject to the dower interest of Annie Ringer held by Maui and Clarke.[23] In 1920,

[23] The United States questions the effect on any title of the United States to Palmyra of the disclaimer of interest in Palmyra by Hawaii. The United States asserts that all public lands of Hawaii passed to the United States by the Joint Resolution of July 7, 1898, and the Resolution of the Senate of Hawaii of September 9, 1897. Rev. Laws, Hawaii, 1905, pp. 36, 40. Thereafter, in 1900, it is said that Con-

Cooper leased the Island to Meng and White who assigned the lease to the Palmyra Copra Company. In 1922 Cooper sold for $15,000.00 all but two of the islets to Mr. and Mrs. Fullard-Leo, respondents here, who had taken over the lease. From the foregoing, it will be apparent that from 1862 to the breakdown of negotiations a paper title existed in respondents and their predecessors in title, except for the grant from the Kingdom, and that there has been a record of the conveyances in Hawaii since 1885. There was, during these years, a claim of right to exclusive possession.

That claim of right was manifested not only by transfers of paper title but also by actual user of the property. The sufficiency of actual and open possession of property is to be judged in the light of its character and location.[24]

gress made provision for the disposition of such lands. Hawaiian Organic Act, 31 Stat. 141; § 73 of the Organic Act, as amended in 1910, § 5, 36 Stat. 444; § 2432, Rev. Laws, Haw., 1905. The position of the United States is that there was no power in Hawaii to disclaim any interest that the United States might have in Palmyra in 1912. We need not resolve this issue. The Land Court record is referred to as another instance of the claims of respondent to Palmyra adverse to the claim of ownership of the United States and its predecessors in title to the public lands of Hawaii.

[24] A statement of this Court in *United States* v. *Pendell*, 185 U. S. at 197, is pertinent:

"There are no adverse claimants to the land in question, and the proof of possession, exclusive in its nature, has been satisfactory to the court below. What constitutes such possession of a large tract of land depends to some extent upon circumstances, the fact varying with different conditions, such as the general state of the surrounding country, whether similar land is customarily devoted to pasturage or to the raising of crops; to the growth of timber or to mining, or other purposes. That which might show substantial possession, exclusive in its character, where the land was devoted to the grazing of numerous cattle, might be insufficient to show the same kind of possession where the land was situated in the midst of a large population and the country devoted, for instance, to manufacturing pur-

It is hard to conceive of a more isolated piece of land than Palmyra, one of which possession need be less continuous to form the basis of a claim. This tiny atoll in the Pacific, however, far removed from any other lands and claimed by no sovereignty until 1862 was not wholly valueless, commercially, prior to the establishment of airways over the ocean.

From time to time, men thought there might be something gained from its exploitation. Bent's "representation" in 1862 for annexation was preceded by an acquaintance with the locality for a number of years. When he went to take possession he planted vegetables and melons, built a house and sought sea products. The Pacific Navigation Company had men on the island during 1885 and 1886. Cooper visited the island in 1913 and 1914. He was then the owner of record. In 1912, at Cooper's suggestion, the then Governor of Hawaii requested the Secretary of the Interior of the United States to send an American vessel to Palmyra to confirm American sovereignty. The Governor stated that Mr. Cooper was then the owner and that the private title to Palmyra had been in citizens of Hawaii since 1862. In 1920 and 1921 the Palmyra Copra Company was actively engaged on the island under a lease from Cooper. The Fullard-Leos, who acquired title to all but two of the islands from Cooper, visited the island in 1924 and again in 1935. On many occasions during the interim, they gave permission to various persons to visit the island.

From these evidences of claim of title and possession were the District Court and the Circuit Court of Appeals

poses. Personal familiarity with the general character of the country and of its lands, and also knowledge of the nature and manner of the use to which most of the lands in the same vicinity are put, have given the judges of the court below unusual readiness for correctly judging and appreciating the weight and value to be accorded evidence upon the subject of possession of such lands as are here involved."

justified in entering a decree that the fee simple title to Palmyra is vested in respondents? The dissent in the Circuit Court of Appeals points out that our cases applying the lost grant doctrine required "uninterrupted and long continuing possession of a kind indicating the ownership of the fee." This is the rule. But, as we have indicated above, uninterrupted and long-continued possession does not require a constant, actual occupancy where the character of the property does not lend itself to such use.[25] No other private owner claims any rights in Palmyra. From the evidence of title and possession shown in this record, we cannot say that the decrees below are incorrect.

*Judgment affirmed.*

Mr. Justice Rutledge, with whom The Chief Justice, Mr. Justice Black and Mr. Justice Murphy concur, dissenting.

I agree with the dissenting judges in the Circuit Court of Appeals that the possession shown on behalf of respondents is not sufficient to establish the presumption of a lost grant, even if title can be acquired from the Government in that manner. According to my understanding, the possession, to have that effect, must be actual, open, notorious, adverse and continuous from the time when the grant is presumed to have taken place.[1] Here for long

---

[25] See *Fletcher* v. *Fuller,* 120 U. S. 534, 543.

[1] "And hence, as a general rule, it is only where the possession has been *actual,* open and exclusive for the period prescribed by the statute of limitations to bar an action for the recovery of land, that the presumption of a deed can be invoked." (Emphasis added.) *Fletcher* v. *Fuller,* 120 U. S. 534, 551. "The possession must be adverse, exclusive, and *uninterrupted,* and inconsistent with the existence of title in another." (Emphasis added.) *Peabody* v. *United States,* 175 U. S. 546, 550. The statement in the authorities that the possession must be uninterrupted has been qualified only to the

periods the possession was constructive at the most, not actual. By the same token it was not continuous.[2]  I do not think this Court should expand the established basis

extent that "This presumption may . . . , in some instances, be properly invoked where a proprietary right has long been exercised, although the exclusive possession of the whole property, to which the right is asserted, may have been *occasionally interrupted* during the period necessary to create a title by adverse possession, if in addition to the actual possession there were other open acts of ownership." (Emphasis added.)  *Fletcher* v. *Fuller, supra,* at 552.  And the presumption of continuing possession which exists "in the absence of evidence to the contrary," *Lazarus* v. *Phelps,* 156 U. S. 202, 204, even if competent to furnish the basis for the further presumption of a lost grant, is here rebutted by the evidence which has been introduced. See note 2.

[2] The following summary of the island's history was given, with supporting record references, in note 3 of the dissenting opinion, 156 F. 2d 756, 760, filed by Denman, C. J., with whom Bone, C. J., agreed, in the Circuit Court of Appeals:

"Zenas Bent visited the island in April, 1862, and left five men there. In June annexation was formally proclaimed.  It does not appear how long the five men remained on the island but in December of the same year Bent transferred all his interest to Wilkinson.  Wilkinson died in 1866 and his will was probated in New Zealand giving his rights in Palmyra to his wife, Kalama.  Nothing further occurred until 1885 when the supposed title was transferred to the Pacific Navigation Company, a conveyance being executed by two of Kalama's heirs and Bent's deed being acknowledged, 23 years after its execution.  Thus, except for the five men left on the island by Bent in order to make the annexation effective, there is no indication that there was any possession or even visits to the island for the 23 years following annexation. On the contrary, the fact that Bent's deed was not acknowledged until 1885, after conveyance by Kalama's heirs, clearly indicates that, in the meantime, no claim of title or possession was asserted by anyone.

"Employees of the Pacific Navigation Company occupied the island for approximately a year in 1885 and 1886 and the company paid taxes in 1885, 1886 and 1887, not to the United States but to the Territory. (The claimant placed the lands on the tax rolls and in many cases taxes were paid on public lands.)  This company's project apparently failed and there followed another long period when the island was

for acquiring title to government lands so as to include acquisition by adverse possession, as in effect the Court's opinion does.    Accordingly, I dissent.

vacant.   Some time between 1889 and 1897 a British vessel visited the island and finding it uninhabited, claimed it for that country.   In 1912 at the instigation of Henry Cooper who had just acquired the supposed title and whose Land Court proceeding to register it was pending, a vessel of the United States Navy visited the island in order to confirm this country's claim to it.   No occupants were found on the island.   In 1913 and 1914 Cooper made short visits of two or three weeks to the island and built a house thereon.   However, the island was not permanently occupied and in 1914 evidence was found that since the 1913 visit Japanese bird poachers had been there.

"In 1920 another attempt was made to commercially develop the island.   It was leased by Cooper; a corporation, The Island of Palmyra Copra Company, was organized; and a 'settlement group' was sent to the island.   This project was not successful and its activities terminated after about a year.   The Fullard-Leos bought Cooper's rights in 1922 but only visited the island twice, once in 1924 for twelve days and again in 1935 for one day.   Between 1922 and the time this suit was commenced, no one lived on the island.   It was most frequently visited by United States Navy or Coast Guard vessels which were in the neighborhood.   In fact, Fullard-Leo went on the Coast Guard vessel 'Itasca' when he visited the island in 1935.   Occasionally, vacationists or scientists made short visits to the island. During this period an unnamed man lived there for two or three months.   On another occasion (1936) a party from Tahiti went there in an attempt to find a cargo of button shells which were rumored to have been jettisoned by an unseaworthy boat.   By 1938, the house which Cooper built in 1913 had collapsed and all the various visitors testified they did not see any evidence of occupation in recent times."

From these facts the dissenting judges concluded: "In the 77 years from the royal proclamation of taking in 1862 to the filing of the instant case in 1939, the occupancy of the island has been less than two and one-half years.   Of this a year was in the years 1885–86 and a year in 1920.   In the interim, from 1862 to 1939, there was no one residing there under a claim of possession—the occasional visitors' brief stays being for other purposes."   156 F. 2d 756, 765; and see *id.* at note 3.