In re Application of JESUS ANDERSON IGLESIAS, Appellee

Civil No. 37-A

In re Application of PEDRO ATOIGUE ROJAS and NIEVES CASTRO ROJAS, Appellants

Civil No. 38-A

In re Application of FRANCISCO C. CARBULLIDO and MARIA C. CARBULLIDO, Appellant

Civil No. 41-A

District Court of Guam

Appellate Division

August 21, 1963

*Counsel for Civil No.*
*37-A; Appellant:* RICHARD D. MAGEE, *Deputy Attorney*
 *General;* JOHN P. RAKER, *Deputy*
 *Island Attorney*

*Applicant-Appellee:* TURNER, BARRETT & FERENZ
*Patricia L. G. Ignacio:* E. R. CRAIN and RAMON V. DIAZ

*Counsel for Civil No.*
*38-A; Appellants:* RICHARD D. MAGEE, *Deputy Attorney*
 *General;* JOHN P. RAKER, *Deputy*
 *Island Attorney*

*Applicant-Appellee:* E. S. TERLAJE

*Counsel for Civil No.*
*41-A; Applicant-*
*Appellee:* E. S. TERLAJE

*Appellee:* RICHARD D. MAGEE, *Deputy Attorney*
 *General;* JOHN P. RAKER, *Deputy*
 *Island Attorney*

Before SHRIVER, *Judge*, District Court of Guam; FURBER, *Chief Justice*, High Court of the Trust Territory of the Pacific Islands

SHRIVER, *District Judge*

## OPINION

The above entitled appeals from the Island Court of Guam to the Appellate Division of the District Court of

Guam have been consolidated for the purpose of this opinion because they involve the common question as to what evidence must be presented, as against the objections of the government of Guam, to justify the Island Court in directing the registration of fee simple titles in the applicants, or in denying such registration. Both Island Court judges were involved in these determinations below and are therefore not eligible to assist here. Chief Justice Furber and I constitute a quorum. The facts will be discussed in connection with each individual case. In theory at least we take judicial notice of the laws of Guam under the Naval Government of Guam and of the general history of Guam to the extent that such laws and such history may affect land titles.

After sovereignty over Guam was acquired by the United States under the Treaty of Paris from Spain, the government of Guam was placed under the Secretary of the Navy who governed through naval governors. Guam land records do not show any direct grants of land in Guam by the Spanish Crown. There are, however, records of possessory rights—often translated as "possession by information" —which have repeatedly been accepted as a proper starting point for title under the Land Title Registration Act.

Early naval governors took the position that all land in Guam was the property of the United States because of the failure of inhabitants to prove up their titles to land under Spanish law. This concept was not reduced to practice as value was paid when the naval government had occasion to acquire private land for governmental purposes. However, the naval government was required to pay for governmental services out of local revenue. The early reports of the naval governors to the Secretary of the Navy contain constant complaints over having to use local funds to pay for obligations of the United States, such as the support of the governor's palace, the support of a leper colony which was

established to protect the military from contact with alleged lepers. Two teachers of English had to be placed on the navy strength as laborers in order to provide this assistance. There were no surveys except as the Naval government was able to make surveys with its limited facilities. There does not appear to have been a land shortage for agricultural purposes so that the average family was only interested in enough land to provide for family needs.

Obviously, one of the major necessities confronting the Naval government was to get land claims placed of record for both title purposes and for the collection of taxes. As the naval governor had full legislative and executive authority, he issued Executive Orders having the Force and Effect of Law. We now turn our attention to some of these Orders which appear in No. 38-A, the application of Pedro Atoigue Rojas and Nieves Castro Rojas for initial registration of land.

General Order No. 3, August 21, 1899, provided that for the protection of Government interests and as a safeguard for the residents of Guam against speculators and adventurers, the consent of the Government had to be obtained before land could be sold. This concept of governmental approval appears to have existed throughout the Naval government. Any transfer of land had to be approved by a lands attorney who determined whether the grantor had title. As will be noted hereafter, a deed not so approved was not recorded but was maintained in the records for information.

General Order No. 15, March 13, 1900, required all owners or claimants to land to register the same by May 15, 1900 or their ownership would not be recognized.

General Order No. 23, August 10, 1900, provides, in part, that no public or unclaimed land should be occupied without the written permission of the Governor.

General Order No. 31, May 23, 1901, established a homestead system under which the applicant could obtain a permit, prove up on the land and have title registered in him. It is to be noted that General Order No. 52, March 6, 1903, annuls General Order No. 31 upon the ground that no further concession of public lands to private persons will be made until the Federal Congress shall make provision therefor. We have been unable to find that this legal position was ever changed.

General Order No. 42, April 9, 1902, provided that General Order No. 15 was not intended to affect title which had been obtained or could be perfected under the Spanish land law.

General Order No. 153, February 28, 1910, amends Article 391 of the Spanish "Mortgage Law" and sets up a procedure whereby persons who claim to be in possession of land under such law may prove up their titles. Section 3 provides that after the publication of this order, no transaction affecting real property shall be recorded unless the first record is in accordance with the Order or unless a certificate of survey is attached if the property was recorded previously.

General Order No. 181, May 16, 1914, provides that persons occupying land must take steps to prove their rights, that permission to occupy public lands must be obtained from the government; if they do not do so they may not claim reimbursement for improvements made.

As will be pointed out hereafter, none of the claims involved herein complied fully with these Naval government requirements. Guam was occupied by Japan. The process of recapturing it involved the destruction of nearly all buildings and most survey markers. The economy changed as the United States took possession of large land areas for housing the destitute and for developing the military bases. This was done by the Navy and subsequently the effort was

made to survey the land taken, determine ownership and pay just compensation. Land was leased for use by contractors and rental payments were based upon surveys approved by the owners to whom rental was to be paid. These combined economic developments resulted in large increases in land values and the undoubted effort on the part of some to split up the public domain. It is of course the responsibility of the present government of Guam to oppose any effort to obtain title to land through court proceedings if the public interest is not fully protected.

All of the proceedings herein were brought under the provisions of the Land Title Registration Act, 1157, et seq., Civil Code of Guam. This Act was taken from California, where it failed, and future registrations were eliminated. It is noted that Section 1157.107 which provided for a Title Assurance Fund, was repealed by P.L. 5–88, 5th Guam Legislature, effective March 15, 1960, so that the Guam law lacks one of the essentials for a true Torrens system. While the owners of a lesser estate may bring the land within the Act, Section 1157.4, the fee simple title must first be registered, Section 1157.6. The questions presented here are as to whether the petitioners have shown that they are the owners in fee simple of the land in question as against the contention of the government of Guam that no fee simple titles were shown. One adjacent property owner contested the claim of the petitioner and this will be considered in due course.

*I. Application of Jesus Anderson Iglesias, Civil No. 37-A.*

The court below decreed that the land should be registered in the name of the applicant over the opposition of the government of Guam and, in part, of Patricia L. G. Ignacio, Administratrix of the estate of Teresa S. Leon Guerrero, deceased. We first dispose of the claim of the

Administratrix that the application includes part of the land belonging to the estate. We agree with the court below that this adverse claim must fail. These lands were agricultural lands when taken over by the Navy to provide facilities for a large cost plus contractor. The Navy caused a survey to be made upon which survey the tracts of the claimants appeared. The claimants approved the survey by signing the map. The Navy then paid rentals for the land based upon the survey and approvals. After the land was turned back, the Administratrix attempted to show that the prewar ownership included part of the petitioner's land as agreed to on the Navy map. The court below held against this as it is readily apparent that to hold otherwise would open the door to continued litigation. The Administratrix was well aware of the area included in the map and is bound by it.

█ The United States was joined as a party but was dismissed on the ground of lack of jurisdiction. The government of Guam admits that the petitioner is entitled to have registered title to approximately 3 hectares of land as against the 6 hectares plus found by the trial court. We point out that our agreement with the trial court is limited to the facts of this particular case. The title is first established in 1901 by a rough description of the land. The land was taken temporarily by the Navy and rentals paid for its use. While the government questions the use of Exhibit 8, the first professional survey of this area, this map shows not only the entire area but individual surveys. The petitioner approved this survey. Certainly this approval did not show title in him, but the map also contains numerous surveys of land listed as belonging to the Naval Government of Guam. These were approved by the Attorney General for that government. Later, after the land had been turned back, the petitioner requested that the tax rolls

135

of the government of Guam be changed to increase his tax assessment in accordance with the survey. This was done with the approval of the government of Guam, through its attorney general. No question was presented until this petition was filed.

The government in its brief has cited ample authority to show that in special circumstances where the boundaries are not reasonably clearly indicated, 3 hectares cannot mean 6 hectares, but that ordinarily the area is the least certain element of a description and the last element to be considered in determining boundaries. In the present instance we cannot deal in exactitudes. There was too much guess work in estimating areas when this title was established. Exact areas were neither required nor possible. Land values were probably less than the cost of a survey, even if a competent surveyor were available. This land has become valuable because it was built up by the Navy and its contractors. The trial court had the advantage over us in that the judge is familiar with prewar conditions and the loose method followed in determining areas. We cannot say that in this case the petitioner is attempting to claim part of the public domain. His claim to ownership has been subjected to the scrutiny of both the Naval government and the present government. We affirm.

## II. Application of Pedro Atoigue Rojas and Nieves Castro Rojas, Civil No. 38-A.

In Iglesias, supra, we affirmed the lower court, not on the basis of adverse possession, but on the ground that on all the evidence in that particular case the quantity of land involved was properly held to have been included in the original general description. In the instant case we must determine whether applicants may prove fee simple title, again in the circumstances of the particular case, when the original grant was not accepted for recordation. The gov-

ernment of Guam did not show that the original grantor was without title, but only that he did not have title of record when he granted the property. Again we must bear in mind the conditions which existed at the time.

An instrument dated January 26, 1918 and filed for record on that date purported to convey the property in question here from Mariano Camacho to Pedro Rojas. On February 5, 1918, Pedro Rojas deeded this property and two others to Vicente Diaz Flores as security for a $500 loan. It is noted that this instrument is well drafted and was executed before a judge of the Island Court. This instrument was likewise denied recordation but cautionary notices were made. The instrument was canceled on December 6, 1920, presumably because the $500 was repaid. The government does not question that taxes were paid on the property and that Rojas was in continuous possession of the property until 1944 when it was taken under some informal arrangement by the Navy for a contractor's camp. The Navy surveyed the land and the United States formalized its possession by a series of duly recorded leases which together cover the period from July 1, 1951 to June 30, 1961, paid rent under these to the applicants, and finally returned possession to the applicants. There is nothing to indicate that the ownership of the land by the applicants was ever questioned by anyone until the petition for registration was filed in 1962. The Navy surveyed the land and surrendered it to the applicants. The Acting Director of Land Management, the department charged with recording instruments and preserving records showing the land holdings of the government of Guam, was asked (Tr. p. 12) whether his records indicated that the government of Guam had any interest in this property. He replied that the government of Guam did not have any interest in the property except for easements and that the property did not adjoin any government property.

The appellant has sought to show that a part of the land is included within document 25219 dated February 26, 1952, conveying to the government of Guam all the lands which were transferred to the Secretary of the Interior under Executive Order 10178, 15 F.R. 7313, which is set out in full in 48 U.S.C.A. pages 600–602. The Acting Director of Land Management at one point testified that he believed a portion of the land fell within that conveyed by the above mentioned document, but later expressed doubt about it. It should be noted that that document only covered lands which had been selected by the Secretary of the Navy for transfer or sale pursuant to the Act of November 15, 1945, 59 Stat. 584, to persons in replacement of lands acquired for military or naval purposes in Guam, "a list and description of such lands being on file in the Department of the Navy". It is not to be presumed on this meager evidence that the United States, through the Navy, was paying rental on this land to the applicants for years if the Secretary of the Navy had already determined that it was government land and had transferred it.

There is a tendency, long after the fact, in these cases to ignore or belittle the surveys made by the Navy and the large establishment created by the Navy to examine into titles as a basis for eminent domain proceedings or the payment of just compensation for use. This property was never surveyed until the Navy did it. The original deed to Rojas showed a consideration of $250.00. The amount of land approximates closely the tract upon which taxes were paid. We fully agree that title cannot be acquired against either the United States or the government of Guam by mere adverse possession, but in this case we believe that the applicants have made out a proper case for the presumption of a lost grant and that the United States and the government of Guam, if either of them ever had any beneficial interest in this land, were estopped by their laches from now

asserting it effectively. It should be further noted that the Guam Land Title Registration Act, lacking one of the essentials of a true Torrens system as noted above, in effect provides merely a system of quieting title which is essentially an equity matter and in which equitable considerations must be considered. For the proposition that laches and estoppel in such matters apply against the government, see *People of Porto Rico v. Livingston* (1931) 47 F.2d 712, in which the court stated at page 722:

"The District Court also grounded its equity jurisdiction on laches and estoppel and there is much to sustain its ruling both on the facts and law; . . . . The equity jurisdiction is clearly established by the answer setting up in substance a cross-bill to quiet title and remove a cloud and praying for affirmative relief; and in equity, as against the government asserting title, the defense of equitable estoppel and laches, which are very potent on the facts in this case, are, of course, available. . . ."

The situation here is in many ways similar to that in *Carino v. Insular Government of the Philippine Islands* (1909) 212 U.S. 449, 29 S.Ct. 334, which was a land registration case arising in the Philippine Islands in which the applicant had no paper title but the Supreme Court of the United States held that the land would be presumed to have been held in private ownership and could be registered as such. See also *Reavis v. Fianza* (1909) 215 U.S. 16, 30 S.Ct. 2; *United States v. Fullard-Leo* (1946) 156 F.2d 757; and *United States v. Fullard-Leo* (1947) 331 U.S. 256, 67 S.Ct. 1287, in which the Supreme Court of the United States stated at page 270:

"The presumption of a lost grant to land has received recognition as an appropriate means to quiet long possession. It recognizes that lapse of time may cure the neglect or failure to secure the proper muniments of title, even though the lost grant may not have been in fact executed. The doctrine first appeared in the field of incorporeal hereditaments but has been extended to realty. The rule applies to claims to land held adversely to the sovereign."

139

We affirm on the ground that the government of Guam has not shown that it has title, either in fee or under its control, as against the record made by the applicants establishing a prima facie case of ownership based on the presumption of a lost grant.

*III. Application of Francisco C. Carbullido and Maria C. Carbullido, Civil No. 41-A.*

██ In a comprehensive opinion the court below denied the applicants registration in fee simple of Lot No. 444, Municipality of Agat. The court found that petitioners' predecessor, Jose Q. Chaco, received a deed from Tomas C. Charfauros on March 16, 1926. This deed was denied recordation because it was not shown that Charfauros had title to the property; that Jose Q. Chaco took possession of the land and raised crops thereon; that about 1927 a cadastral survey included this land. Monuments were erected.

In holding that the applicants had not shown ownership in fee simple the court pointed out:

1. That there was no showing that the land was privately held within the meaning of the Treaty of Paris, 13 Stat. 1754, April 11, 1898; that Crown lands passed to the United States.

2. That on February 26, 1952, the Secretary of the Interior, by Document No. 25219, conveyed land, including this land, to the government of Guam; that prior to 1952 title to the land was in the United States of America.

3. That as against the title vested in the government of Guam in 1952, Sections 315 and 325 of the Guam Code of Civil Procedure are not applicable and that the deed from the Secretary of the Interior contains a reversionary clause under which this land would revert to the United States if the land were declared to be in fee simple in the applicants.

It is unfortunate that the government of Guam has never placed before the courts a complete history of the develop-

140

ment of taxing and title procedures under the Naval Government of Guam. This defect was remedied in part by the testimony of Judge Bitanga in the present case. Judge Bitanga has appeared as an expert witness for the United States in many condemnation proceedings in the District Court where he impressed all of us with his remarkable memory for ownership, land areas, etc., of land before World War II. His experience in this area began in 1919. He became a land judge and senior board member of the Board of Appraisers. He described the practice of this Board. They were required each three years to appraise real property for tax purposes. The Board notified the village commissioners to have all landowners available to have their lands appraised. They went upon the land, and in the absence of surveys, got the landowners to agree as to their boundaries. He testified that when government land was involved the land judge could set the boundary for government land. He recalled that the land in question here had been surveyed and monuments placed and that it was used as a ranch with a fence on one side. Otherwise, the land was entirely surrounded by government land.

We are convinced that the Naval Government of Guam permitted occupancy of Crown land by permit but that under General Order No. 52, March 6, 1903, it never changed its position that it had no authority to concede public land to private persons until the Federal Congress "shall make provision therefor." The writer of this opinion had occasion to make a study of the annual reports submitted to the Secretary of the Navy by the naval governors. One of the governors established a Torrens system for registering titles which followed the lines of the present Land Title Registration Act. Land which had been approved for registration became the subject of a certificate of guaranteed claim. The original certificate provided that the Naval Government would guarantee the title against the

141

world but this wording was changed to provide that the Naval Government would defend the title against the world. In his annual report the naval governor stated that he recognized that titles so obtained were not valid as against the United States but that it was assumed that when Congress legislated permanently for Guam, the Congress would recognize the propriety of the action. By 1950 when the Organic Act of Guam was enacted, this was ancient history and nothing was done by the Congress to waive any interest the United States might have in favor of private persons who may have occupied land owned by the United States.

As we have previously pointed out, we are not considering in these cases the right to possession but the question of fee simple title. *Sauget v. Villagomez*, 228 F.2d 374 (9th Cir., 1955) involved the question as to whether a purchaser of registered land could eject an occupant who had built a house on such land under an alleged oral agreement to purchase the land. The Court of Appeals held, in part:

"On the evidence the trial court was entitled to find that Villagomez had purchased some property right known to the Spanish civil law formerly applicable to Guam, which corresponds to a common law easement entitling Villagomez to own and occupy a house on the land."

■ We agree that adverse possession does not run against either the United States or the government of Guam. We are also of the opinion that in this case the evidence is not strong enough to establish either the presumption of a lost grant or an estoppel of the government based on laches. The evidence as to open possession under claim of ownership, as to the exact area involved, and as to acknowledgment by the government of the applicants' ownership, is not nearly as strong as in the Rojas case. P.L. 1–56, effective January 27, 1960, is a comprehensive

Marketable Title Act which validates titles of record held before January 1, 1935, but it is noted, Section 1218.10, Civil Code of Guam that

"Except that this Article shall not be deemed to affect the right, title or interest of the United States of America or the territory of Guam to any lands in the territory of Guam."

Section 315 of the Code of Civil Procedure provides

"The government of Guam will not sue any person for or in respect to any real property, or the issues or profits thereof, by reason of the right or title of the government of Guam to the same, unless:

1. Such right or title or cause of action shall have accrued within 10 years before any action or other proceeding for the same is commenced; or,

2. The government of Guam, or those from whom they claim, shall have received the rents and profits of such real property, or of some part thereof, within the space of 10 years; or,

3. The Governor of Guam by special order shall direct an action to be brought."

This section was taken from California, except for the provision authorizing the Governor to direct that an action shall be brought. This section may give certain possessory rights to the applicant-appellants but in Guam where proprietory rights in government of Guam land do not exist, the right to possession, if it exists, is not fee simple title, *People v. Kerber*, 152 Cal. 731, 93 P. 878 (1908), and *Bartholomew v. Staheli*, 86 C.A.2d 844; 195 P.2d 824:

"Moreover, property owned by the state is held in trust for the people of the state, and may not be lost or abandoned through the negligence of its officers or agents."

In affirming the Island Court we invite the government of Guam to make inquiry as to whether this is not a situation wherein title to this property would not have been good if title had not been in the United States. There may

be other instances where initial possession and development may have been in contemplation of eventual title in reliance upon the policies of the Naval Government of Guam.